**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**NEW YORK FOREIGN TRADE ZONE
OPERATORS, INC., Defendant-
Appellee.**

No. 21, Docket 26883.

United States Court of Appeals
Second Circuit.

Argued Oct. 10, 1961.

Decided June 20, 1962.

Morton Hollander, Chief, Appellate Section, Dept. of Justice (William H. Orrick, Jr., Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., John G. Laughlin and Ronald A. Jacks, Attys., Dept. of Justice), for plaintiff-appellant.

John F. Smith, New York City (John Nielsen, New York City, of counsel), for defendant-appellee.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

The plaintiff, United States of America, as assignee of a personal injury claim of its employee, Joseph Garcia, brought this action for negligence against the defendant, New York Foreign Trade Zone Operators, Inc. From a judgment entered upon a jury verdict in favor of the defendant, the plaintiff appeals.

On the date of his injury, January 20, 1957, Joseph Garcia was employed as a waiter aboard the USNS *General W. G. Haan,* which was then docked at Pier 16, Stapleton, Staten Island, in New York harbor. The defendant owned and operated the pier, which was 1000 feet long. A warehouse extended almost the full length of the pier and spanned its entire width except for a narrow space used as a pathway, called a "stringpiece," five to eight feet wide, between one side of the warehouse and the edge of the pier.

Under its dockage contract with the Navy the defendant promised to provide seamen with access to the *General Haan* and to keep the means of access in good condition. During the weekends the warehouse was locked, so seamen had to walk along the stringpiece in order to travel to and from the ship. On a Sunday afternoon while walking along the stringpiece toward the ship Garcia slipped and fell. He was injured seriously.

Under the Federal Employees' Compensation Act, § 1, 39 Stat. 742 (1916), as amended, 5 U.S.C.A. § 751 (1958), Garcia received compensation for his injury from the Government.

As required by statute, he then, on July 7, 1958, assigned to the United States any claim he might have against the defendant that the defendant was legally liable in damages for his injuries. Federal Employees' Compensation Act § 26, 39 Stat. 747 (1916), as amended, 5 U.S.C.A. § 776 (1958), as amended. Pursuant to this assignment the United States, on August 6, 1958, brought the present action against the defendant. The Government alleges that Garcia's injury was a result of the defendant's negligent failure to remove snow and ice that had accumulated on the stringpiece. The defendant maintains that the snow and ice had been removed at the time of the accident and that Garcia's own negligence had contributed to his injury.

The case was tried in November 1960. Garcia and his fellow-seaman Matthews, who had seen the accident, testified to the icy condition of the stringpiece, and that Garcia fell because the ice caused him to slip. In addition, the Government produced as a witness Garcia's immediate superior, Gordon, the *Haan's* chief steward, in order further to substantiate its contention that there was ice on the stringpiece at the time of Garcia's mishap. On January 21, 1957, the day following the accident, Gordon had prepared an official report of the event, as statute and regulation required him to do. Federal Employees' Compensation Act § 24, 39 Stat. 747 (1916), as amended, 5 U.S.C.A. § 774 (1958), as amended; 20 C.F.R. § 1.3. The report was made by filling in blank spaces on a government form provided for the purpose. It contained Gordon's account of the accident[1] and a brief signed statement by Matthews.[2] After Gordon identified this

---

1. "Garcia was returning to the vessel to serve the evening meal and had to walk along the pier stringpiece since the pier was closed for the week end. There was ice and snow on the stringpiece left over from a recent storm. As he attempted to cross a patch of ice, he slipped and fell, striking his left arm and shoulder, injuring same."

2. "On Sunday, 20 Jan 1957, at approximately 1550 hours, I was going ashore after completing my watch aboard the USNS Gen. W. G. Haan (T–AP158). I saw Joseph Garcia walking toward me when his feet shot out from under him, his body twisted and he fell on his left side."

Matthews' testimony given on the stand was similar. The pertinent part follows:

"Q. Tell us what you saw and what you did. A. * * * It was very icy and it was cold, and coming down the

report, it was offered in evidence while he was on the witness stand, and, over objection, was admitted into evidence under the exception to the hearsay rule provided by the Federal Business Records Act, 28 U.S.C. § 1732 (1958). After testifying that the report had been based not only on information he had received from others but also upon his own personal knowledge obtained from his own investigation, Gordon was dismissed as a witness without ever otherwise being asked to testify to his knowledge of the accident or to any other matters contained in his report. The contents of the report were not revealed to the jury.

Three days later, after the trial evidence had been closed and after the court had ruled upon the requests to charge that the parties had submitted to it, the court reversed its prior ruling, excluded Gordon's report, and forthwith submitted the case to the jury without permitting the jurors to see it, or permitting the report to be read to them.

As we have said, one Matthews, a fellow-seaman, testified to the accident as an eye-witness. He was the first witness, and during cross-examination, after a number of questions had been asked designed to bring out that Matthews'

recollection of the occurrence was somewhat hazy, the following took place:

"Q. Now, when was the first time you talked to anybody about this case, Mr. Matthews? A. I think it was last—last summer, the Federal Bureau investigator came to my home.

"Q. And at that time did you tell him about this other man that was with you? A. At first I couldn't remember anything until he showed me this copy which I had signed in making out thé accident report.

"Q. Just a minute. You say until this man came and showed you something you couldn't remember anything about this accident? A. It was a very long time before, April, 1957, until last year.

"Q. And this man when he came to your house did he tell you how the accident happened? Did he tell you about it? A. He did.

"Q. He did? A. Yes.

"Q. And after he told you about it then you knew about the accident, is that right? A. Began to come back, because after I saw my signature, and read the paper I had signed, the accident report." [3]

---

gangway with the friend, the fellow who stood watch with me, and we were on our way home, approaching Mr. Garcia, and all of a sudden he slipped and fell.

\*　\*　\*　\*　\*

"Q. Just tell us what you saw.
"The Court: And what you did.
"A. I saw Mr. Garcia fall. He slipped. His feet went completely from underneath him and he fell on his left side.
"Q. And were you able at that time to see the conditions of the stringpiece? A. Very much so.
"Q. What was the condition? A. Very slippery and icy."

3. The entire redirect examination was as follows:
Redirect Examination by Mr. Hopkins:
"Q. Mr. Matthews, did you make a report aboard the vessel? A. (No answer.)

"Q. Did you sign a statement aboard the vessel the day after the accident? A. I did, sir.
"Q. I show you a copy which is Plaintiff's Exhibit—
"Mr. Lyons: I object to this, your Honor.
"Mr. Hopkins: No, your Honor, because he—
"The Court: You will have to lay the proper basis for it.
"Mr. Hopkins: He has attempted to show that this man had no recollection, never made any statement with respect to this accident until it was indicated by the FBI.
"The Court: Your own witness testified that he had made one and he remembered that he made one.
"Mr. Hopkins: Well, could I have it identified now?
"The Court: No.
"Mr. Hopkins: That is all I have.
"The Court: You are excused.
"(Witness excused.)"

The report that Gordon had made would have corroborated Matthews and Garcia, and, in view of the personal interest of Garcia and the attack upon Matthews' credibility, would have greatly strengthened the Government's case.

That the jury was greatly troubled and could have used more enlightenment is evident from what occurred after they received the case. They had deliberated for an hour when they requested that Matthews' testimony be read to them. This having been done, the jury again retired, only once more to request "additional information, possibly set forth in the report of the FBI agent's conversation with Mr. Matthews in April 1957. Our basic interest is in what Mr. Matthews reported in the document he signed the day after the accident as to the stringpiece being icy and very slippery." The court pointed out that no FBI report was in evidence [4] and that they were limited to the content of Matthews' testimony on the stand. This testimony was then read a second time, and thereafter the jury informed the court that it could not arrive at a unanimous verdict. Later, after an additional charge, the jury returned its verdict for the defendant. After verdict the Government's motions for judgment n. o. v. and for a new trial were denied, and the court entered judgment upon the verdict. The Government then appealed to this court.

It would seem from the jurors' conversations with the trial judge in which they expressed their interest in the condition of the stringpiece and their interest in what Matthews had said about the accident the day after the event, that the unavailability to the jury of Gordon's report corroborating Matthews undoubtedly prejudiced the Government's case. Therefore, the issue before us is whether the district court was correct in reversing itself after all the evidence had been closed and in then excluding Gordon's

compensation report from evidence after it had been admitted, over objection, during plaintiff's case, under the Federal Business Records Act. That act provides, insofar as is applicable:

§ 1732. Record made in regular course of business * *

"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term "business," as used in this section, includes business, profession, occupation, and calling of every kind."

Prior to the enactment in 1936 of this statute there had long been a common-law exception to the common-law rule excluding hearsay under which it was permissible to admit business records into evidence; in fact, there had been several such exceptions but with different requirements for their application. See Maguire, Note, 56 Harv.L.Rev. 458, 462–64 (1942). Though hearsay, business records were believed to have been prepared by methods and under circumstances that made them more trustworthy than other hearsay, and therefore business records could safely be admitted

---

4. The jurors never asked for the report that Gordon prepared the day after the accident and sent to Washington. In fact, they never knew that the statement by Matthews that had piqued their curiosity was attached to that report.

into evidence as tending to prove the transaction recorded without the truth-testing provided by a cross-examination of the maker or keeper of the records. But these common-law exceptions to the exclusion of hearsay records had nevertheless become so circumscribed by so many petty and confusing limitations that lawyers often found it extremely difficult to get their clients' ordinary business records into evidence. See 5 Wigmore, Evidence § 1520 (3d ed. 1940); Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 18 F.2d 934, 937 (2 Cir. 1927). To facilitate the admission of business documents by reducing the confusing restrictions which had existed at common law, and which had hampered their admission, a committee of legal scholars in 1927 under the auspices of the Commonwealth Fund proposed the relatively brief and apparently simple statute set forth above, providing for the admissibility into evidence of certain writings, memoranda, and records therein described for the purpose of tending to prove the fact that what was therein noted as having taken place did take place. Several states adopted the suggested statute, and in 1936 Congress enacted it as the Federal Business Records Act, 49 Stat. 1561, as amended, 28 U.S.C. § 1732 (1958).

■ One of the purposes of the statute was to do away with the common-law prerequisite to admission of a business record that a party call the entrant as a witness to authenticate the record, or, if the entrant did not testify, to call someone to explain why the entrant was unavailable. Ettelson v. Metropolitan Life Ins. Co., 164 F.2d 660, 667 (3 Cir. 1947); S.Rep. No. 1965, 74th Cong., 2d Sess. 1 (1936); H.R.Rep. No. 2357, 74th Cong., 2d Sess. 1 (1936); McCormick, Evidence §§ 289, 290 (1954). The statute explicitly dealt with some of the other uncertainties that had sometimes excluded a business record from evidence, and further provided that, though the record would be admissible, the weight to be accorded it would be affected by the lack of knowledge which the maker of the record personally had of the occurrence recorded. Unfortunately, the statute failed to give specific answers to a number of questions affecting the independent admissibility of records. Among these unanswered questions was the question now before us for decision: Whether a memorandum that an employer requires be made of an occurrence that resulted in personal injury is a memorandum made in the regular course of business of the employer?

■ The broad policy of the statute was to bring the rules for the admission into evidence of business writings, records and memoranda more nearly into line with the standards relied upon by businessmen in making business decisions outside of court. 5 Wigmore, op. cit. supra, at § 1530a; see Morgan et al., The Law of Evidence—Some Proposals for Its Reform xxi (1927). "The statute was designed to bring the realities of business and professional practice into the courtroom in usable form * * *" Korte v. New York, N. H. & H. R. R., 191 F.2d 86, 91 (2 Cir.), cert. denied, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652 (1951). Since the Government in order to provide compensation for its injured employees relies every day on reports filled out on forms it furnishes for this purpose, it would seem that we should hold such reports to be admissible under 28 U.S.C. § 1732 if we are to be consistent with the overall policy of the statute.

Moreover, the language of the statute, as businessmen would use that language, see Maguire, supra, at 468, supports the conclusion that Gordon's report should have been admitted. It is beyond dispute that this report was made pursuant to a regular procedure, that Gordon made the report within a reasonable time after the accident, and that the entrant and the informants were under a duty to make the report.

But the Supreme Court in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), has instructed us that the statute requires more than the ordinary business sense of its words

would indicate that it requires. There the Court upheld a district court's refusal to admit into evidence an accident report offered by the defendant railroad that had been prepared by one of its locomotive engineers. The Court concluded that the report was not made in "the regular course of business" of the railroad because the report was not prepared "for the systematic conduct of the business as a business." Id. at 113, 63 S.Ct. at 480. Instead the Court said the report's "primary utility [was] in litigating, not in railroading." Id. at 114, 63 S.Ct. at 481. Obviously the Supreme Court was concerned about a likely untrustworthiness of materials prepared specifically by a prospective litigant for courtroom use. See Pekelis v. Transcontinental & W. Air. Inc., 187 F.2d 122, 130 (2 Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951).

■ The report of Garcia's accident has a primary utility different from that which the Supreme Court found the report in Palmer v. Hoffman to have had. Gordon's report was required in order to have a supervisor's report accompany Garcia's formal claim to compensation from the Government under the Federal Employees' Compensation Act, 5 U.S.C.A. § 774 (1958). If this statutorily required report were prepared with an eye to litigation, it would have been in contemplation of a suit by Garcia against the Government. Gordon's report might be inadmissible under the holding in Palmer v. Hoffman upon the trial of such an action, because the preparation of the report with that litigation in mind might give the report indicia of unreliability as to the issues which such a suit might raise. But an action by the injured employee against the Government, based as it would have been on a claim for a statutorily fixed compensation award payable to him regardless of fault on the part of anyone, would have involved issues far different from those involved in the present action by the Government against the pier owner, based on a claim that the pier owner was negligent. Therefore, Palmer v. Hoffman does not

require us to hold Gordon's report inadmissible in this action. It must be remembered that the making and keeping of any business record, even the most routine, advantages a recordkeeper in the event that litigation arises. We do not understand Palmer v. Hoffman to require the exclusion from evidence of all records which were made with some contemplation that they might be valuable in the event of litigation. Since the policy and language of the Federal Business Records Act support the admissibility of the excluded report and since it was not prepared primarily with a view to the litigation between the Government and the pier owner, we hold that the district court was in error when it excluded the report.

■ Moreover, the purpose behind the Federal Business Records Act is to permit the introduction into evidence of reports in substitution for the actual testimony in court of the persons making the reports. See 5 Wigmore, op. cit. supra, § 1631. Here, Gordon, the maker of the report, was on the stand and testified in person. After the report was admitted into evidence government counsel did not further interrogate Gordon, and the witness did not testify to the content of what he had reported. However, he was available and subject to cross-examination. His credibility and the trustworthiness of his report could have been inquired into. Of course, in view of what happened later defense counsel was trial-wise in not taking advantage of this opportunity but nevertheless the opportunity was present. Therefore, the trial posture of this case was quite dissimilar from the trial posture of those cases where the report is sought to be introduced independently without a witness-stand identification of it by its actual maker.

■ Moreover, it is always permissible for a federal trial judge to comment to the jury on the evidentiary worth of any item of evidence. Here, after Gordon, the maker of the report, had identified the report as his, and then the report had been admitted into evidence

for the purpose of proving the fact of the occurrence Gordon had therein detailed, the trial court should not have later excluded the report from the jury's consideration. If the court had doubted the reliability of Gordon's report, he should have warned the jury that un-cross-examined but admissible hearsay evidence is often less reliable than testimony in open court.

Upon a cursory examination, the decisions of our court interpreting the impact of the Federal Business Records Act may appear to be inconsistent with the result reached here. Closer inspection discloses that our previous holdings are not inconsistent but are in accord.

In Pekelis v. Transcontinental & W. Air. Inc., 187 F.2d 122 (2 Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951), we held that the district court was erroneous in refusing to admit the plaintiff's offer of certain accident reports prepared by boards set up by the defendant airline to investigate the crash of one of defendant's airplanes. We interpreted the decision in Palmer v. Hoffman to exclude accident reports only when they were prepared for use in litigation or when there was other indicia of their untrustworthiness. The Pekelis reports, the court pointed out, " * * * were against the interest of the entrant when made, * * * were clearly not part of a story cooked up in advance of litigation in the disguise of business records" and were offered as evidence by the party opposing the one which had had the reports prepared. 187 F.2d at 130.

In Korte v. New York, N. H. & H. R. R., 191 F.2d 86 (2 Cir.), cert. denied, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652 (1951), another accident case, the district court had admitted certain doctors' reports, offered by the plaintiff, which had been prepared at the request of the defendant railroad. We affirmed the district court. Again, we pointed out that the decision in Palmer v. Hoffman was directed against the admission of hearsay evidence prepared for a litigious or other self-serving purpose. The court in

Korte doubted whether the Palmer v. Hoffman rationale extended to reports made by independent doctors. Regardless of this, the Korte court stated that its holding could rest on Pekelis, where it had been held that reports offered by the party adverse to the party for whom the reports were prepared were admissible.

The recent decision of this court concerning the issue now before us, Puggioni v. Luckenbach Steamship Co., 286 F.2d 340 (2 Cir. 1961), was an unseaworthiness-negligence case brought by a longshoreman against a shipowner. The district court had refused to admit an accident report offered by the defendant Luckenbach which had been prepared by the third-party defendant Turner & Blanchard, Inc., the stevedoring concern for which the plaintiff worked. We reversed the district court on grounds not relevant to the Federal Business Records Act. But since the court was remanding the case to the lower court for a new trial, the district court was advised that upon the retrial it could admit into evidence reports made by persons other than the party offering the reports if the circumstances of their preparation indicated that the reports were sufficiently trustworthy.

In Central R. R. Co. v. Jules S. Sottnek Co., 258 F.2d 85 (2 Cir. 1958), cert. denied, 359 U.S. 913, 79 S.Ct. 588, 3 L.Ed. 2d 574 (1959), we upheld admission of a report prepared by a fire marshal from his investigation of the waterfront fire which resulted in that lawsuit. We held that since the fire marshal testified orally, his prepared report was merely cumulative of his testimony, and since the appellants had not objected to his testimony, but had, in fact, called the other investigating fire marshal as their own witness, they could not obtain a reversal because the report had been admitted. Thus, the holding in that case is not contrary to the position now taken.

The Court of Appeals for the Third Circuit in Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3 Cir. 1950), decided an issue similar to the one

now before us. In the Moran case the Court of Appeals reversed a district court's exclusion of a report, offered by the plaintiff, made by the Bureau of Mines of the United States Department of the Interior based on that Bureau's investigation of the Cleveland gas tank disaster of 1944. Pointing out that the Bureau was charged with the statutory duty of making such reports, the appellate court in that case concluded that the preparation of the report was within the "business" of the Bureau as that term was used in the Federal Business Records Act. Similarly, in the present case, Gordon was charged by statute with the duty to make a report and, similarly, it was part of the Navy's "business" for the report to be made.

The judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

CLARK, Circuit Judge (concurring).

I concur in the judgment of reversal and in the over-all conclusions of Judge WATERMAN'S careful and reasoned opinion. But in my judgment the statute 28 U.S.C. § 1732 not merely permits, but requires, that the result be reached more directly and in less labored fashion. For the distinguished and scholarly proponents of this legislation foresaw this type of problem and provided the answer in the statute itself, that "[a]ll other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but *such circumstances shall not affect its admissibility.*" [Italics added.] Here seems clearly a case for the application of this explicit principle. What basis has a trial judge for holding a regular report such as is here involved, made by a person not a party to the litigation, to be inadmissible? Presumably he is acting because he thinks it untrustworthy within the meaning of the statutory gloss suggested in Central R. Co. v. Jules S. Sottnek Co., 2 Cir., 258 F.2d 85, certiorari denied 359 U.S. 913, 79 S.Ct. 588, 3

L.Ed.2d 574, and pressed still further in Puggioni v. Luckenbach S.S. Co., 2 Cir., 286 F.2d 340. But I submit that the statute gives him no such power.

It is true that where one accused of active negligence made a statement exculpating himself, for use in litigation, the Supreme Court declined to hold this a report made in the ordinary course of business. Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719. But as we have had occasion to point out, this was a wholly exceptional case and should not be taken as giving the judge general power to exclude entries he questions and thus substantially to destroy the value and the convenience of this remedial statute. Our discussions and holdings in Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, 23 A.L.R.2d 1349, certiorari denied Transcontinental & Western Air, Inc. v. Pekelis, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374, and Korte v. New York, N. H. & H. R. Co., 2 Cir., 191 F.2d 86, certiorari denied New York, N. H. & H. R. Co. v. Korte, 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652, fully sustain this conclusion. I do not feel that we can properly support the statutory glosses, advanced more or less as dicta, in the Central R. Co. and Puggioni cases cited above.

MOORE, Circuit Judge (concurring in the result).

I am in accord with the result reached, namely, that there should be a new trial. In my opinion, however, it is not necessary or advisable to pass upon the admissibility of Gordon's report in advance of a new trial but since the majority has chosen at this time to declare that the report is admissible, I feel constrained to set forth the reasons why I believe on the facts before us that the report is inadmissible under the provisions of 28 U.S.C.A. § 1732.

Not every paper is admissible in evidence merely because it is a printed form which contains space for the writing of answers to various printed categories or questions. This is an age of the printed

form of which there must be tens of thousands in daily use by government and business. But the superimposition of printer's ink upon a sheet of white paper does not thereby change a self-serving declaration into a regular-course-of-business report under § 1732. In other words, some analysis of the circumstances under which the report was prepared and its function and purpose must be made in order to determine whether it is admissible under fundamental rules of evidence. The Supreme Court in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943) and this court in Puggioni v. Luckenbach S.S. Co., 2 Cir., 1961, 286 F.2d 340, and Central R. R. Co. of N. J. v. Sottnek, 2 Cir., 1958, 258 F.2d 85, cert. den. 359 U.S. 913, 79 S.Ct. 588, 3 L.Ed.2d 574, have definitely indicated that form is not to prevail over substance.

In Palmer v. Hoffman, supra, a report had been made by the engineer of the train causing the accident. The report was excluded on the trial. The Supreme Court affirmed the exclusion and in so doing stated certain principles applicable here. In that case, the railroad company sought to use its employee's report to exonerate it from liability; in this case, the government offers its employee's report to establish liability. As to the report by the engineer, Mr. Justice Douglas said, "But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act" (318 U.S. p. 113, 63 S.Ct. p. 480).

The argument which appellant advances and the majority accept, namely, that Gordon was charged by statute and regulation with making a report is completely answered by the Supreme Court in Palmer wherein the Court points out that where Congress has imposed the duty of making reports and has also said that such reports should not be "admitted as evidence or used for any purpose in any suit or action for damages growing out of any matter mentioned in said report or investigation" (45 U.S.C.A. § 41). "That legislation reveals an explicit Congressional policy to rule out reports of accidents which certainly have as great a claim to objectivity as the statement sought to be admitted on the present case" (318 U.S. p. 115, 63 S.Ct. p. 481).

In Puggioni, supra, this court said that "this circuit has construed Palmer v. Hoffman to give trial judges discretion to determine whether the circumstances surrounding accident reports made by others justif, their acceptance in evidence" (286 F.2d p. 344) and in Sottnek said, "The trial judge must exercise caution to be sure that a document offered under this statute has an inherent probability of trustworthiness" (258 F.2d p. 88). These statements are quite inconsistent with the holding here that without giving to the trial judge the opportunity to pass upon the critical issue, the report untested by appropriate criteria shall be received in evidence.

What does analysis of the report reveal? Gordon was the chief steward of the vessel on which Garcia, the injured crew member, was a waiter and was Garcia's immediate superior. It was Gordon's duty to report that Garcia had been injured. Gordon was not an employee of the defendant and it was not part of his duties for the defendant or even for the government to investigate or to report upon the cause of the accident. Parenthetically, there is no factual basis for the assumption in the majority opinion that, "If this statutorily required report were prepared with an eye to litigation, it would have been in contemplation of a suit by Garcia against the Government." The Government was not the owner of, or responsible for the condition of, the pier. The report was solely for the purpose of recording Garcia's injury. It was not to determine cause or fault. The majority immediately recognize this distinction by pointing out that a suit by Garcia against the Government "would have been on a claim for a statutorily fixed compensation

award payable to him *regardless of fault on the part of anyone*" (emphasis supplied) and concedes that it "would have involved issues far different from those involved in the present action by the Government against the pier owner, based on a claim that the pier owner was negligent." Thus, since the only purpose of the report was to record the fact that Garcia had been injured, there is no reason to believe that the report would be a particularly trustworthy account of immaterial facts (immaterial to the report) such as the presence of ice and snow on the pier.

There can be no doubt that the report, if prepared and submitted by Garcia to the government as a statement of claim for compensation for injuries, would have been inadmissible against the defendant if he had written therein that the cause of the accident was snow and ice which had been allowed to remain on the walk along the side of the pier. The report would have been clearly self-serving.

Gordon's report, if sought to be introduced by plaintiff to establish liability because of the condition of the pier, would have been equally self-serving. However, the report could have been used when Gordon was on the stand to refresh his recollection. Thus, the error committed to the prejudice of plaintiff was the admission of the report followed by its exclusion after the trial was over. Once the report was received, plaintiff's counsel was entitled to rely upon its receipt in evidence and to assume that it was available to him for all purposes, including reading and exhibiting it to the jury during trial and upon summation. For this reason, he may well have decided not to press Gordon further as to such personal knowledge, if any, he might have had concerning conditions on the stringpiece or to refrain from using the report to refresh his recollection. But just as plaintiff's counsel was deprived of the opportunity to use the report, so also, by now holding the report to be admissible, is defendant's counsel deprived of any opportunity to inquire into all the facts and circumstances which may well bear upon admissibility even under § 1732. Thus, I cannot agree that this court should in advance of a new trial hold the report to be admissible, and thus reach a result quite at variance with Sottnek and Puggioni.