322 F.2d 622
 Maxwell SHENKER, Libelant-Appellee,
v.
UNITED STATES of America, Respondent-Appellant-Appellee,
v.
AMERICAN STEVEDORES, INC., Respondent-Impleaded-Appellant.
 No. 315.
 Docket 27949.
 United States Court of Appeals Second Circuit.
 Argued May 7, 1963.
 Decided August 21, 1963.
 
 Michael J. Kenny, New York City (George J. Conway, New York City, on the brief), for respondent-impleaded-appellant.
 Stanley P. Danzig, New York City (Fuchsberg & Fuchsberg, New York City, on the brief), for libelant-appellee.
 Philip A. Berns, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C. (John W. Douglas, Asst. Atty. Gen., Joseph P. Hoey, U. S. Atty., Leavenworth Colby, Chief Admiralty & Shipping Section, Dept. of Justice, Morton S. Hollander, Chief, Appellate Section, Civil Div., Dept. of Justice and Louis E. Greco, Atty. in Charge, New York Office, Admiralty & Shipping Section, Dept. of Justice, on the brief), for respondent-appellant-appellee.
 Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.
 MARSHALL, Circuit Judge.
 
 
 1
 This is an appeal by the United States, defendant below, and by American Stevedores, Inc., which was impleaded as defendant, from an interlocutory decree in admiralty entered in the United States District Court for the Eastern District of New York after a trial before Judge Rosling, sitting without a jury. The decree awarded a judgment in the amount of $12,500 to the libelant, Maxwell Shenker.
 
 
 2
 Shenker is a stevedore timekeeper who was injured on May 28, 1957, while aboard the Lt. Robert Craig, a naval vessel owned and operated by the United States which was moored at the Brooklyn Army Terminal. Asserting jurisdiction under the Public Vessels Act, 46 U.S.C. §§ 781-790, he brought suit against the United States, alleging unseaworthiness and negligence. The United States then impleaded as defendant American Stevedores, the stevedoring contractor which employed Shenker, seeking indemnity from it, under the terms of an express contract between the parties, for any recovery which Shenker might have.
 
 
 3
 At the close of all the evidence, the district court in an unreported opinion held that the United States was liable to Shenker because of the unseaworthiness of the Lt. Robert Craig, "but that libelant's own fault contributed in equal degree to the accident." Damages of $25,000 were found and a judgment of $12,500 was entered since the court's finding that libelant's contributory negligence was 50 per cent responsible for the accident resulted as a matter of law in a reduction by 50 per cent of the total amount of damages to which he would otherwise have been entitled. Ktistakis v. United Cross Navigation Corp., 316 F.2d 869 (2 Cir., 1963); Dunbar v. Henry DuBois' Sons Co., 275 F.2d 304 (2 Cir.), cert. denied, 364 U.S. 815, 81 S. Ct. 45, 5 L.Ed.2d 46 (1960); Boat Dagny, Inc. v. Todd, 224 F.2d 208 (1 Cir., 1955). Libelant's claim was disallowed to the extent that it rested upon an allegation that the United States was negligent. Cf. Poignant v. United States, 225 F.2d 595 (2 Cir., 1955). The district court further held that the United States, under the terms of its contract with American Stevedores, was entitled to indemnification from the stevedoring contractor in the amount which it was required to pay to Shenker.
 
 
 4
 The United States appeals from the judgment in favor of libelant, urging in the alternative that if that judgment is affirmed, the judgment awarding it indemnity against American Stevedores also be affirmed. American Stevedores appeals from the judgment in favor of libelant and from the indemnity judgment in favor of the United States. Shenker, resting upon his judgment, has not appealed; there is thus no challenge by any party to the district court's findings that Shenker was contributorily negligent and in a degree that was 50 per cent responsible for causing his injuries.
 
 
 5
 The findings of fact of the district court are amply supported by the record and we sustain them as not clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). Briefly stated, they present the following picture of the events leading to the accident in which Shenker was injured.
 
 
 6
 On May 28, 1957, Shenker, who was then 62 years old, was performing his duties as timekeeper for American Stevedores at a pier at the Brooklyn Army Terminal. The Lt. Robert Craig had been moored starboard side to the pier since May 22 while longshoremen employed by American Stevedores, working under a governmental contract, discharged and loaded the vessel's cargo. Shenker worked from an office at the pier. On the day of the accident he had been instructed by his supervisor, one Perrone, who was the head timekeeper, to ascertain when the stevedores who were working aboard the ship would quit work that day. After attempting to obtain the information by telephone and receiving no answer, Shenker decided to go aboard the ship to consult with Domenic Judice, the American Stevedores foreman in charge.
 
 
 7
 Shenker boarded the ship shortly before 2 p.m., by means of the starboard accommodation ladder. Once aboard he turned right and walked forward along the starboard side of the main deck until he saw Judice walking along the portside of the main deck. Shenker yelled to Judice in order to attract his attention. When he noticed Shenker, Judice waved and beckoned to him. Judice mounted the No. 2 hatch from its portside and Shenker mounted it from the starboard side. The hatch, a box-like structure measuring 24 feet long and slightly more than 22 feet wide, was raised about 40 inches above the main deck and had been covered with protective tarpaulins and battened down. The two men met at approximately the center of the hatch and engaged in a conversation for a minute or two about whether the stevedores would complete the cargo operations before five o'clock. When the conversation was completed, they proceeded to walk together to the starboard side of the hatch.
 
 
 8
 Shenker intended to get off the hatch by "squatting down" at the edge of it, placing his hand on the tarpaulin for support, and easing himself down onto the deck. However, when he and Judice came to within a few feet of the starboard side of the hatch, he unexpectedly stubbed his toe against a piece of dunnage — a plank of lumber about four feet long, a foot wide, and an inch thick — which had been lying on the hatch but which neither man had seen earlier. Shenker pitched forward and fell to the deck, the board falling with him. He sustained multiple injuries which necessitated a lengthy period of hospitalization and medical care, and was left with a marked limp.
 
 On cross-examination Shenker was asked:
 
 9
 "Q. And as you walked — how far a distance did you walk from where you were standing in the center of the hatch, talking to Mr. Judice? How far did you walk over to the edge of the hatch in distance? A. Maybe ten, twelve feet.
 
 
 10
 "Q. During that ten or twelve feet, did you have occasion once to look down where you were walking and to look ahead of you? A. No, I didn't. We were looking and talking to each other, looking at each other."
 
 
 11
 In finding on these facts that Shenker was contributorily negligent, the district court said, "His very unfamiliarity with the vessel which serves him in his disclaimer of knowledge of routes less perilous than the one he selected, called upon him to exercise a commensurately greater caution * * *. A minimal regard for his own safety demanded that he look about him as he walked in alien surroundings — not in the unobservant fashion he adopted wherein he was oblivious to lurking danger underfoot."
 
 I.
 
 12
 We deal first with the challenges made by appellants to Shenker's right to recover.
 
 
 13
 Under legal principles now well established, a ship and its owner are liable to indemnify a seaman for injuries caused by the unseaworthiness of the vessel or its appurtenant appliances and equipment. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). See Note, 76 Harv.L.Rev. 819 (1963). The shipowner's duty to furnish a seaworthy ship is not a duty to furnish an accident-free ship; "it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960); Gutierrez v. Waterman Steamship Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); Massa v. C. A. Venezuelan Navigacion, 298 F.2d 239 (2 Cir., 1962). "Thus, the concept of the unseaworthiness of a ship is a relative one, dependent for definition in each instance upon the circumstances in which her fitness is drawn into question." Mosley v. Cia. Mar. Adra, S.A., 314 F.2d 223, 227 (2 Cir., 1963).
 
 
 14
 The district court found that the Lt. Robert Craig was unseaworthy because of the unaccounted presence on the No. 2 hatch of the plank of lumber over which Shenker tripped. It held that the presence of such "a random object, not serviceable as dunnage for any stevedoring use," created a "danger, not integral to the necessary operations of the ship" which in the circumstances rendered the ship less than reasonably fit for its intended use. It has often been held that dangerous and uncertain conditions underfoot may constitute transitory unseaworthiness. See, e. g., Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Ktistakis v. United Cross Navigation Corp., 316 F.2d 869 (2 Cir., 1963); Pinto v. States Marine Corp., 296 F.2d 1 (2 Cir., 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Blier v. United States Lines Co., 286 F.2d 920 (2 Cir.), cert. denied, 368 U.S. 836, 82 S.Ct. 32, 7 L.Ed.2d 37 (1961). The district court here found that in walking on the hatch Shenker and Judice were giving it an intended use because they "were following a customary practice" that was "foreseeable as a likely one by the owner and was consonant with a shipboard procedure recognized as permissible." The holding that the Lt. Robert Craig was unseaworthy, which in any event appellants do not appear to challenge, was therefore entirely proper. The fact that it may have been the responsibility of American Stevedores to remove all excess dunnage does not, of course, relieve the shipowner of its obligation to provide and maintain a seaworthy vessel. That duty is a nondelegable one. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Rogers v. United States Lines Co., 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954).
 
 
 15
 The primary challenge made by appellants is to the holding of the district court that Shenker was entitled to sue upon the shipowner's warranty of seaworthiness because his duties as timekeeper came within the scope of traditional seamen's work. The Supreme Court has held that the shipowner's duty to furnish and maintain a seaworthy vessel is a duty owed not only to seamen but also to longshoremen and stevedores employed by someone other than the shipowner who are injured in the course of their employment aboard the vessel while "doing a seaman's work and incurring a seaman's hazards." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 99, 66 S.Ct. 872, 879-880, 90 L.Ed. 1099 (1946); Reed v. Steamship Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963); Crumady v. The J. H. Fisser, 358 U.S. 423 (1959); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). The answer to the question of whether libelant comes within "that broadened class of workmen to whom the admiralty law has latterly extended the absolute right to a seaworthy ship," Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 629, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959), thus depends upon the character of the work he was performing. United N. Y. & N. J. Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599 (2 Cir.), cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960).
 
 
 16
 Shenker testified that his duties as timekeeper included keeping the payroll records of the longshoremen gangs employed by American Stevedores at the work site, compiling a "running activity" of "whatever the gangs in the different hatches on the various ships did that particular day — opening the hatch, rigging, starting, opening the 'tween decks or going down to the lower hold, and then starting to load cargo or discharge cargo from the ship," and obtaining every morning a report of the respective amounts of tonnage of different categories of cargo loaded during the prior day. In order to obtain the information for these records, Shenker usually would go aboard ship, he said, "once in the morning and once in the afternoon." In addition, he testified that it was necessary for him to go aboard ship in order to carry out other miscellaneous duties, such as checking the identification number of a longshoreman who might have checked in with the wrong one, checking the type of cargo that was being loaded in a particular hatch, making a record of the stowage of cargo in the different compartments of a hatch, and checking for any damage that might have occurred to cargo.
 
 
 17
 On the day on which he was injured, Shenker had been instructed by his superior to ascertain when the stevedores who were working aboard the Lt. Robert Craig would quit work that day. When he was unable to obtain this information by means of telephone calls to the ship, he decided to go aboard to see the foreman in charge in order "to check the time that this gang in hatch No. 1 was going to work, whether they were going to work to finish their work before five o'clock or whether they would go past five o'clock."
 
 
 18
 On the basis of this testimony, the district court found that the "clerical activities of libelant exposed him in their performance to certain of the hazards which the stevedores encountered in their more laborious output of physical effort" and that he was "an integral participant in the maritime activities of the stevedores" because "all alike were participating in the common maritime undertaking of moving cargo in and out of the vessel." These findings and conclusions are amply justified. The keeping of payroll and cargo records plays an important part in the orderly operation of a ship. In carrying out his duty of keeping such records, as well as in carrying out his miscellaneous duties, all of which required, as the district court found, that he be aboard ship frequently, Shenker performed tasks which are a normal and necessary incident to the effective functioning of the ship. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Ross v. Steamship Zeeland, 240 F.2d 820 (4 Cir., 1957). The district court was therefore correct in holding that he was entitled to the protection afforded by the shipowner's warranty of seaworthiness.
 
 
 19
 Appellants also contend that it was error for the district court to exclude from evidence an entry made in the official log book of the Lt. Robert Craig by one Rosteck, who was third officer on the ship between the hours of 8 a. m. and 4 p. m. on the day of libelant's accident. The proffered entry read:
 
 
 20
 "1350 — Max Shenker (American Stev. Timekeeper) tripped over batten on #2 hatch and hurt left leg. Was taken to dispensary."
 
 
 21
 In appellants' view, the log entry had a material bearing on the issue of the cause of Shenker's accident because it tended to establish that he tripped over a batten rather than a piece of dunnage.
 
 
 22
 Rosteck testified that he did not witness the accident and that the information embodied in the entry came to him "by word of mouth" from "one of the stevedore's bosses on the foredeck." The entry was therefore hearsay and inadmissible as such, as the district court properly concluded. See McCormick, Evidence §§ 225-27 (1954).
 
 
 23
 Appellants argue, however, that the entry should have been admitted into evidence under the exception to the hearsay rule created by the Federal Business Records Act, 28 U.S.C. § 1732, which makes admissible generally any writing made in the regular course of business as a memorandum or record of an event. Although this argument is not without some force, see 5 Wigmore, Evidence, § 1523 (3rd Ed.1940); United States v. New York Foreign Trade Zone Operators, Inc., 304 F.2d 792 (2 Cir., 1962), we think on balance that the district court was correct in rejecting it on the authority of Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). In that case the Supreme Court upheld a district court's refusal to admit into evidence an accident report offered by the defendant railroad that had been prepared by the engineer of a train involved in a grade crossing accident. The rationale of Palmer is directly applicable to the present case. Indeed, it seems likely that the statement held inadmissible in Palmer would have been more probative than the log entry excluded in the present case because it was more detailed, and would have been more trustworthy because it was "based on the reporter's first-hand knowledge," McCormick, Evidence § 287 (1954), rather than upon the conceded second-hand knowledge that Rosteck relied upon. See Central R. Co. of N. J. v. Jules S. Sottnek Co., 258 F.2d 85 (2 Cir., 1958), cert. denied, 359 U.S. 913, 79 S.Ct. 588, 3 L.Ed. 2d 574 (1959). Whatever may be the propriety of using a log entry to prove that an accident actually occurred — and denial of such an opportunity of proof can hardly be deemed prejudicial to appellants — the district court did not abuse its discretion in holding that under the facts of this case the entry might not be used to prove the details of that accident. Puggioni v. Luckenbach Steamship Co., 286 F.2d 340 (2 Cir., 1961).
 
 
 24
 Having found no merit in any of the arguments raised in opposition to libelant's right to recover, we affirm the judgment in favor of Shenker on the grounds relied upon by the district court and set out above.
 
 II.
 
 25
 We turn now to the appeal taken by American Stevedores from that portion of the district court's opinion granting indemnification to the United States in the amount of Shenker's recovery.
 
 
 26
 The stevedoring operations aboard the Lt. Robert Craig in the course of which libelant was injured were being conducted by American Stevedores under a contract which it had entered into with the United States. The crucial sections of the agreement touching the liability of American Stevedores, as contractor, provided as follows:
 
 
 27
 "Clause 12. Liability and Insurance.
 
 
 28
 "a. The Contractor
 
 
 29
 * * * * * *
 
 
 30
 "(2) shall be responsible for and shall hold the Government harmless from any and all loss, damage, liability and expense for * * * bodily injury to * * * persons occasioned in whole or in part by the negligence or fault of the Contractor, his officers, agents, or employees in the performance of work under this contract. The general liability and responsibility of the Contractor under this clause are subject only to the following specific limitations.
 
 
 31
 "b. The Contractor shall not be responsible to the Government for and does not agree to hold the Government harmless from loss or damage to * * * bodily injury to * * * persons:
 
 
 32
 "(1) If the unseaworthiness of the vessel * * * furnished by the Government contributed jointly with the fault or negligence of the Contractor in causing such * * * injury * * * and the Contractor, its officers, agents, and employees, by the exercise of due diligence, could not have discovered such unseaworthiness * * * or through the exercise of due diligence could not otherwise have avoided such * * injury * * *"
 
 
 33
 The district court held, as a matter of contract interpretation, that the United States was entitled to recovery over from American Stevedores in the amount that it was required to pay to Shenker. It based this result upon two findings of fact which are adequately supported by the record.
 
 
 34
 First, it found, as we have already noted, that Shenker had been contributorily negligent in failing to watch where he was walking. Second, it found that Judice had been negligent in at least an equal degree with Shenker, "for had Judice been minimally mindful of his footing as he walked beside Shenker on the hatch cover he would surely have seen the scrap dunnage over which Shenker stumbled, in time to warn him or jostle him out of danger." The effect of these two findings was to render American Stevedores, the employer of Shenker and Judice, liable to the United States under Clause 12a(2) of the contract, which provides for indemnification of the United States for losses for injuries "occasioned in * * * part by the negligence or fault of the [contractor's] employees in the performance of work under this contract," see Lamazza v. United States, 190 F.Supp. 692 (S.D.N.Y.1960), and to render inapplicable the exculpatory provision of Clause 12b(1), since the contractor's two employees could, in fact, have discovered the unseaworthiness of the vessel or "through the exercise of due diligence could * * * otherwise have avoided such * * * injury." Once these findings of fact were made, the analysis of the district court fully established the obligation of American Stevedores under the express language of the contract to indemnify the United States. Santomarco v. United States, 277 F.2d 255 (2 Cir.), cert. denied, American Stevedores, Inc. v. United States, 364 U.S. 823, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960).
 
 
 35
 The fact that the negligence of Shenker, as the injured employee, was partially responsible for the accident does not preclude the United States from recovery. The language of the contract neither limits to a particular type of employee the negligence upon which indemnification may be based nor excludes the negligence of any particular employee as a factor which may make the indemnification provision operative. To the degree that the recent opinion in Drewery v. Daspit Bros. Marine Divers, Inc., 317 F.2d 425 (5 Cir., 1963), is to the contrary, we agree with the dissenting opinion of Judge Rives. Id. 317 F.2d at 428. But, in any event, there is no difficulty for purposes of establishing indemnity liability in the present case in imputing the negligence of Judice to his employer, American Stevedores.
 
 
 36
 The existence of the express warranty makes it unnecessary for us to consider or rely upon principles of implied warranty. D'Agosta v. Royal Netherlands Steamship Co., 301 F.2d 105 (2 Cir., 1962); Dery v. Wyer, 265 F.2d 804 (2 Cir., 1959); cf. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958); Damanti v. A/S Inger, 314 F.2d 395 (2 Cir., 1963).
 
 
 37
 Finally, the district court ruled that the United States was entitled to recover from American Stevedores a reasonable award representing the counsel fees, disbursements, costs, and other expenses it incurred in defending against Shenker's claim. This ruling was not improper; expenses such as those here involved are generally recoverable as damages by a shipowner who is awarded indemnity. DeGioia v. United States Lines Co., 304 F.2d 421 (2 Cir., 1962); Paliaga v. Luckenbach Steamship Co., 301 F.2d 403 (2 Cir., 1962); A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., 256 F.2d 227 (2 Cir.), petition for cert. dismissed, 358 U.S. 801, 79 S.Ct. 9, 3 L.Ed.2d 49 (1958); Shannon v. United States, 235 F.2d 457 (2 Cir., 1956); Holley v. The Manfred Stansfield, 186 F.Supp. 805 (E. D.Va.1960).
 
 
 38
 Affirmed.
 
 
 39
 FRIENDLY, Circuit Judge (dissenting).
 
 
 40
 The pushing of a "principle or precedent * * * to the limit of its logic" may take it to a point where it collides with another of greater pertinency and applicability. Cardozo, The Nature of the Judicial Process, 40, and id. at 43. That, in my view, is the result of holding that a shore-based record keeper, covered by the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S. C. §§ 901-950, who stubbed his toe against a plainly visible board, four feet long, a foot wide and an inch thick, can recover $25,000 (reduced to half that sum because of his contributory negligence) for unseaworthiness of the ship against the United States — which then receives indemnity from the stevedoring company for sending on board a clerk who took such poor care of himself.[1]
 
 
 41
 Shenker spent almost all his time on shore. His duties were, in his own words, to keep "a payroll record of the gangs employed on pier two, Brooklyn Army Terminal" and "a running activity of the different ships that were being loaded or discharged * * * so that the company would know just how much cargo to either load or discharge for the purposes of computation of costs." It was on the basis of this "running activity" that the "company in the main office would figure their costs and profits." Occasionally Shenker found it convenient to go on shipboard to get information for his "running activity" record or other purposes.
 
 
 42
 Thus it was that at 2 P.M. on May 28, 1957, Shenker boarded the Lt. Robert Craig, a naval vessel, "to check the time that this gang in hatch No. 1 was going to work, whether they were going * * to finish their work before five o'clock or whether they would go past five o'clock * * *", this being important for his closing of the payroll records. The answer reposed in Domenic Judice, the stevedore foreman. To obtain access to Judice, Shenker traversed the well-battened cover of No. 2 hatch. He crossed to the halfway point without incident, obtained the desired information and came back, with Judice accompanying him. It was near the completion of this return journey that, as the judge found, rather contrary to Shenker's own testimony,[2] he stubbed his toe against what must have been a plainly visible dunnage board on the hatch cover.
 
 
 43
 There are at least two reasons, either of them sufficient, why Shenker's recovery against the ship for unseaworthiness ought not be allowed to stand. He was not performing the kind of work for which recovery for unseaworthiness is allowed, and the Lt. Robert Craig was not unseaworthy. I therefore do not reach the question whether exclusion of the entry in the log book was reversible error, or the issues relating to the United States' recovery of indemnity from American Stevedores.
 
 
 44
 "[T]he norm of the liability [for unseaworthiness] has been historically and still is the case of the seaman under contract with the vessel's owner." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 90, 66 S.Ct. 872, 875, 90 L.Ed. 1099 (1946). This unusual liability is based upon "the hazards which maritime service places upon men who perform it," id. 328 U.S. at 94, 66 S.Ct. at 877, 90 L.Ed. 1099, or, as recently stated, upon "the hazards of marine service, the helplessness of the men to ward off the perils of unseaworthiness, the harshness of forcing them to shoulder their losses alone, and the broad range of the `humanitarian policy' of the doctrine of seaworthiness * * *", Reed v. The Yaka, 373 U.S. 410, 413, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963). Since "historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew", a man engaged in such service is entitled to the benefit of the rule even though he is "employed and furnished by another." 328 U.S. at 96, 66 S.Ct. at 878, 90 L.Ed. 1099. This is so although a contrary result would not at all force him to shoulder his loss alone in view of the remedy against his employer which Congress has provided in the Compensation Act.
 
 
 45
 Although the historicity of the pronouncement in Sieracki that the work of loading and unloading was historically done by the ship's crew has been seriously challenged, see Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Corn.L.Q. 381, 413-14 (1954) and Shields and Byrne, Application of the Unseaworthiness Doctrine to Longshoremen, 111 U.Pa.L.Rev. 1137, 1139-47 (1963), that would not avail the shipowner in an inferior federal court in a case directly within that decision. However, the dubious historical basis for thus giving harbor workers the protection of the warranty of seaworthiness (as distinguished from their rights on account of negligence of the shipowner), the present inapplicability to harbor workers of some of the factors which underlay the development of the doctrine as regards "seamen" in the ordinary sense, the frustration of the policy of the Longshoremen's and Harbor Workers' Compensation Act resulting from combining the principle that a stevedore may recover from the ship for defective gear brought on by his employer, Alaska S.S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), with the liability of the employer to indemnify the ship for this or other negligent action on its part, Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U. S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), and the complexities presented in a trial, and particularly in a jury trial, of the typical three party case,[3] argue against our applying the warranty of seaworthiness to a shore-based office worker unless decisions of the Supreme Court call for that. There is still great wisdom in the admonition of Judge Learned Hand that "we should hesitate to read the [Sieracki] decision as intended to extend the protection of what amounts to a warranty of seaworthiness to all workmen upon a ship, however casual their presence there, and however much their relation to the employer is unlike the early paternalistic status of master and crew * * *", and that any such extension "should await the sanction of the Supreme Court in the exercise of its function of supplying the inadequacies of the past." Guerrini v. United States, 167 F.2d 352, 354, (2 Cir.), cert. denied, 335 U.S. 843, 69 S. Ct. 65, 93 L.Ed. 393 (1948).
 
 
 46
 The relevant Supreme Court decisions subsequent to Sieracki tell us only that a carpenter repairing defective loading equipment "so that the loading could go on at once" is assimilated to "the stevedores then working with him on the ship * * *," Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 412-413, 74 S. Ct. 202, 206-207, 98 L.Ed. 143 (1953), and The Tungus v. Skovgaard, 358 U. S. 588, 595 n. 9, 79 S.Ct. 503, 3 L.Ed. 2d 524 (1959), but that a shore-based electrician cleaning the ship's generators in an engine room is not, United N. Y. & N. J. Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L. Ed.2d 541 (1959). Insofar as application of the warranty of seaworthiness rests on "the hazards of marine service" and "the helplessness of the men to ward off the perils of unseaworthiness," Shenker's case is far weaker than Halecki's, who was spraying the ship's engines with a deadly poison; it is almost ludicrous to apply the quoted phrases to a man who spent almost all his time on shore and only needed to look where he was going to keep himself entirely safe on this occasional adventure on shipboard. The Halecki opinion, 358 U.S. at 618, 79 S.Ct. at 519-520, 3 L.Ed.2d 541, also dispels any notion that Shenker is entitled to the benefit of the doctrine on the simple ground that he was a record keeper and ships carry some men who keep records. The records that Shenker was keeping were not the kind of records historically kept by the ship's crew; rather they were the very kind that would not have been kept if the ship's crew had carried out their supposed historical function of loading her. Shenker, like Halecki, "was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed." Judge Lumbard's dissenting opinion, 251 F.2d 708, 715 (2 Cir., 1958), quoted with approval, 358 U.S. at 618, 79 S.Ct. at 519-520, 3 L.Ed.2d 541. Hawn's and Skovgaard's roles were quite different. If it was traditional for a ship's crew to load, as we must take it to have been, presumably it was equally traditional for the crew to fix loading equipment that had broken down. But it can scarcely have been traditional for the crew to keep records needed to bill the ship for services of third persons that traditionally were not rendered. Although Shenker's activities may have been essential to the ship's being unloaded by a third party, they would not have been required if the ship had unloaded herself; the consideration stressed in Sieracki, "that the owner should not be free to nullify" his obligation as to seaworthiness "by parcelling out his operations to intermediary employers whose sole business is to take over portions of the ship's work," 328 U.S. at 95, 66 S.Ct. at 877-878, 90 L.Ed. 1099, scarcely applies to him.
 
 
 47
 Even if Shenker were entitled to the benefit of the doctrine of unseaworthiness, I would still reverse on the ground that the judge erred in concluding that the presence of a plainly visible piece of dunnage on the hatch cover rendered the Lt. Robert Craig unseaworthy. We have consistently held that unseaworthiness, like negligence, is a question of law not within the scope of the "unless clearly erroneous" rule or its admiralty equivalent. Krey v. United States, 123 F.2d 1008 (2 Cir., 1941); Van Carpals v. S.S. American Harvester, 297 F.2d 9 (2 Cir., 1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84 (1962); cf. Romero v. Garcia & Diaz, Inc., 286 F.2d 347, 355 (2 Cir.), cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961). The Lt. Robert Craig was not a passenger liner; she was a naval vessel in the course of being loaded. She did not cease to be "reasonably suitable for her intended service," Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960), simply because her hatch covers were not so free from every kind of obstruction as a bowling alley or the floor of an operating room awaiting surgery. Nuzzo v. Rederi, A/S Wallenco, 304 F.2d 506 (2 Cir., 1962). The facts bear no resemblance to the conditions of disarray in De Gioia v. United States Lines Co., 304 F.2d 431, 423 (2 Cir., 1962), or to the "accumulation of oil covered by sawdust" in Ktistakis v. United Cross Navigation Corp., 316 F.2d 869 (2 Cir., 1963).
 
 
 48
 I would reverse with instructions to dismiss the libel.
 
 
 
 Notes:
 
 
 [1]
 Perhaps the circle will be completed by the stevedoring company's recovering from Shenker for breach of his undertaking to keep his eyes open, implicit in his contract of employment. Compare Malfitano v. King Line, Ltd., 198 F.Supp. 399, 401 (S.D.N.Y.1961), with Cavelleri v. Isthmian Lines, Inc., 189 F.Supp. 525 (S.D.N.Y.1960), reargument denied 190 F.Supp. 801 (S.D.N.Y.1961), and Johnson v. Partrederiet Brovigtank, 202 F. Supp. 859 (S.D.N.Y.1962)
 
 
 [2]
 The judge rejected this on the ground that Shenker's "claims to total kinesthetic recall of his immediately antecedent bodily gyrations" were "mere reconstructed imagery by a glib but inexperienced witness," who "seemingly had not earlier or, perhaps, sufficiently been admonished by counsel that not all questions put to him need be factually answered."
 
 
 [3]
 See, e. g., Mosley v. Cia. Mar. Adra, S.A., 314 F.2d 223 (2 Cir., 1963); Damanti v. A/S Inger, 314 F.2d 395 (2 Cir., 1963). These complexities will be further increased by development of the law as to cross-claims by the stevedore-employer against the ship, see Pettus v. Grace Line, Inc., 305 F.2d 151, 156 (2 Cir., 1962) (dissenting opinion of Judge Clark); Williams v. Pennsylvania R. Co., 313 F.2d 203 (2 Cir., 1963); Watkins v. Farrell Lines, Inc., 315 F.2d 418 (2 Cir., 1963), — not to speak of claims by the employer against the employee, see note 1, supra