# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2023

Argued: June 10, 2024
Decided: April 30, 2026

No. 23-1218

_____

IN RE: IN THE MATTER OF THE COMPLAINT OF VERPLANCK FIRE DISTRICT.

VERPLANCK FIRE DISTRICT, as Owner of the Firefighting Vessel Marine I, for
Exoneration from or Limitation of Liability,
*Petitioner-Appellee,*

*v.*

TROY DYCKMAN,
*Claimant-Appellant.*[*]

_____

Before:      LEVAL, LOHIER, and LEE, *Circuit Judges.*

Claimant-Appellant Troy Dyckman, a former volunteer firefighter with the Verplanck Fire District, appeals from the grant of summary judgment by the United States District Court for the Southern District of New York (Philip M. Halpern, *J.*) in favor of Petitioner-Appellee Verplanck Fire District. Dyckman suffered injury to his foot while traveling aboard a ship owned by the Verplanck Fire District to the reported site of a boat fire on the Hudson River, when he

---

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

extended his leg to fend off a collision with another vessel. Having previously obtained compensation under New York's Volunteer Firefighters' Benefit Law, Dyckman filed this claim in response to the Fire District's petition in the United States district court to limit its liability to the value of the vessel pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. § 30523, and Rule F of the Supplemental Rules for Admiralty and Maritime Claims. His claim alleged (i) negligence and unseaworthiness pursuant to the Jones Act, 46 U.S.C. § 30104; (ii) unseaworthiness under *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946); and (iii) negligence under general maritime law. The district court granted summary judgment to the Fire District, finding that Dyckman was not eligible to bring claims pursuant to the Jones Act or *Sieracki*, and that the exclusive remedy provision of New York's Volunteer Firefighters' Benefit Law barred Dyckman from bringing his general maritime law claim. Dyckman appealed from the district court's ruling, with the exception of the denial of his Jones Act claim.

We conclude that the district court erred in ruling by summary judgment that Dyckman was not entitled to the warranty of seaworthiness extended to a *Sieracki* seaman, and in ruling that New York's Volunteer Firefighters' Benefit Law barred Dyckman's federal negligence claim under general maritime law. Accordingly, we VACATE the judgment and REMAND to the district court.

BRIAN J. SHOOT (Frank V. Floriani, Stephen C. Glasser, *on the brief*), Sullivan Papain Block McGrath Coffinas & Cannavo P.C., New York, NY, *for Claimant-Appellant*.

GUERRIC S.D.L. RUSSELL, Nicoletti Hornig & Sweeney, New York, NY, *for Petitioner-Appellee*.

LEVAL, *Circuit Judge*:

Claimant-Appellant Troy Dyckman, formerly a volunteer firefighter with

Petitioner-Appellee, the Verplanck Fire District (the "Fire District"), appeals from

a final judgment of the United States District Court for the Southern District of New York (Philip M. Halpern, *J.*), granting summary judgment, denying Dyckman's claims for damages for personal injury. *See In re Verplanck Fire Dist.*, 687 F. Supp. 3d 382 (S.D.N.Y. 2023) ("*Verplanck Fire District*"). His claims were based on an injury to his foot, which he suffered while traveling aboard the Fire District's vessel, the Marine I, to respond to a reported boat fire on the Hudson River. The district court found deficiencies in each of Dyckman's claims and therefore granted the Fire District's motion for summary judgment. We VACATE the judgment and REMAND for further proceedings.

## BACKGROUND

### I. Facts

The Fire District is a volunteer-run firefighting organization, which provides basic life support and fire protection services to the hamlet of Verplanck in Westchester County, New York. While the majority of the Fire District's calls seek land-based assistance, it owns the Marine I, a twenty-five and one-half foot vessel, which it uses to perform fire rescue services in the northern Westchester County segment of the Hudson River.

The Fire District does not have set schedules for its volunteers. So long as a volunteer has completed the necessary training, he may respond to calls for service based upon his "willingness and readiness to respond." App'x at 14. A volunteer is eligible to respond to calls on the Hudson River aboard Marine I once he has taken a boating safety course. To operate Marine I, a volunteer must have taken operational training. The Fire District will respond to a call for service only if a trained operator and a sufficient number of trained personnel volunteer to participate.

Having completed boating safety training, Dyckman was eligible to respond to calls aboard Marine I (but not to operate the vessel). He performed many years of service for the Fire District, first as a junior volunteer firefighter and later as a lieutenant. He worked for the Fire District from 2013 until at least August 2020, when he suffered this injury.

On August 9, 2020, Dyckman and three of his Fire District colleagues boarded Marine I to respond to a report of a boat fire on the Hudson River. As Marine I approached the site, Dyckman saw that a Westchester County police

4

vessel had come into its path.[1] In an effort to prevent a collision, he extended his right foot to fend off the other boat. Despite his efforts, the vessels collided and Dyckman's foot was crushed between the boats. He has since undergone two surgeries.

The Fire District provides compensation and medical payment benefits to its employees (including volunteers) for injuries incurred in the line of duty under the New York State Volunteer Firefighters' Benefit Law. Dyckman applied for and began to receive those benefits, consisting principally of payment of his medical bills and $500 every two weeks. At the time of his deposition, Dyckman was unemployed and his Volunteer Firefighters' Benefit Law compensation benefits were his sole source of income.

## II.    The Proceedings Below

The legal proceedings began on December 7, 2020, with Dyckman's filing suit against the Fire District in the Westchester County Supreme Court. In response, on April 6, 2021, the Fire District instituted this action by filing a petition

---

[1] Dyckman testified in his deposition that he went to the front of the boat to "get the ropes ready to tie off in the front," either on the instruction of a colleague or his own initiative, purportedly to secure the boat by tying it to a mooring or vessel. App'x at 149.

in federal district court to limit its liability pursuant to the Limitation of Liability Act of 1851, 46 U.S.C. § 30523, and Rule F of the Supplemental Rules for Admiralty and Maritime Claims.[2] As provided in those rules, Dyckman filed an answer and claim in district court, asserting his claims for damages. He asserted three distinct bases for compensation: (1) negligence and unseaworthiness pursuant to the Jones Act, 46 U.S.C. § 30104; (2) unseaworthiness under the doctrine of *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946); and (3) negligence under general maritime law.

The Fire District moved for summary judgment. The district court granted the Fire District's motion for summary judgment, finding deficiencies in each of Dyckman's claims. Dyckman then brought this appeal, contesting the validity of the district court's rulings as to unseaworthiness under *Sieracki* and as to negligence under the general maritime law. He did not appeal from the district court's denial of his Jones Act claim.

---

[2] The Limitation of Liability Act limits the liability of the owner of a vessel to the "value of the vessel and pending freight" so long as the damage, loss, or personal injury was incurred "without the privity or knowledge of the owner." 46 U.S.C. § 30523.

**DISCUSSION**

"We review a district court's grant of summary judgment *de novo*, resolving all inferences in favor of the nonmoving party and affirming only where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *RSD Leasing, Inc. v. Navistar Int'l Corp.*, 81 F.4th 153, 158 (2d Cir. 2023) (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126–27 (2d Cir. 2013)). A genuine dispute as to a material fact precludes summary judgment "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020) (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)).

## I. Unseaworthiness Under *Sieracki*

With respect to Dyckman's claim for the Fire District's breach of the warranty of seaworthiness pursuant to *Sieracki*, 328 U.S. 85, the district court concluded that the warranty did not extend to Dyckman for three reasons. First, the court took the position that the *Sieracki* warranty extends to a non-seaman only if his relationship to the vessel is as an independent contractor. Because Dyckman, as a volunteer firefighter for the Fire District, was deemed an employee of the

7

owner of the vessel, the court concluded that he was ineligible. Second, the court reasoned that the *Sieracki* warranty does not extend to land-based workers such as Dyckman. Third, the court took the view that the warranty extends only to those whose job on a vessel is "primarily as an aide to navigation" and that this did not apply to Dyckman, who was not authorized to operate Marine I. For reasons explained below, we disagree with each of the district court's reasons for rejecting Dyckman's *Sieracki*-based claim.

The warranty of seaworthiness is "a duty [of a vessel owner] . . . to furnish a vessel and appurtenances reasonably fit for their intended use." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). While unseaworthiness was once "an obscure and relatively little used remedy," after the Supreme Court's transformation of the seaworthiness warranty into a strict liability regime in *Mahnich v. Southern Steamship Co.*, 321 U.S. 96 (1944), the doctrine became "the principal vehicle for recovery by seamen for injury or death." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 24, 26 (1990) (internal quotation marks and citations omitted).

While, "[h]istorically, a shipowner's duty of seaworthiness under general maritime law ran [only] to seamen in the ship's employ," *id.* at 27, the Supreme

Court's *Sieracki* decision extended the warranty of seaworthiness to non-seamen working aboard a vessel who were "doing a seaman's work and incurring a seaman's hazards," *Sieracki*, 328 U.S. at 99. In *Sieracki*, the Court enforced the obligation of seaworthiness as to a longshoreman employed by an independent stevedoring contractor, working aboard a docked vessel loading the ship's cargo. *Id.* at 87.

After the *Sieracki* decision, a land-based non-seaman working on a vessel could recover from the vessel or its owner "for injuries resulting from [the vessel's] unseaworthy condition," *Gravatt v. City of New York*, 226 F.3d 108, 116 (2d Cir. 2000) (internal quotation marks omitted), if the injury was incurred while the worker was "doing a seaman's work and incurring a seaman's hazards," *Sieracki*, 328 U.S. at 99. Workers so entitled to the unseaworthiness remedy have become known as "*Sieracki*-seamen." *Gravatt*, 226 F.3d at 116 n.9.

In 1972, Congress altered the *Sieracki* remedy by amending the Longshore and Harbor Workers' Compensation Act (the "LHWCA"), 33 U.S.C. §§ 901–950, a federal program that compels employers to pay employees no-fault compensation benefits for injuries sustained on the job by workers in facilities customarily used

9

"in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). The Amendments, *inter alia*, increased the amount of the benefits payable to workers covered by the Amendments. For those workers, in exchange for the increases in benefits, the 1972 Amendments eliminated their right to recover from the vessel (or its owner) for unseaworthiness. *See* 33 U.S.C. § 905(b);[3] *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994).

### A. Whether a *Sieracki* Seaman Must Be an Independent Contractor

The district court ruled that Dyckman was not eligible for *Sieracki* seaman status because, being an employee of the shipowner, he was not an independent contractor. It is true that, in most instances, the rulings upholding a non-seaman's status as a *Sieracki* seaman have been in favor of persons employed by independent contractors. *See, e.g.*, *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 412–13 (1953) (applying *Sieracki* to a carpenter directly employed by a company that refitted ships, which contracted with the vessel owner); *Sieracki*, 328 U.S. at 87 (applying *Sieracki* to a longshoreman directly employed by an independent stevedoring company, which contracted with the vessel owner).

---

[3] *See* discussion of H.R. Rep. No. 92-1441, at 1 (1972) in n.12.

But the justification for entitling those workers to the ship owner's warranty of seaworthiness did not depend on their independence. *See Sieracki*, 328 U.S. at 99 (finding that stevedore's employee was "entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner"). To the contrary, the same warranty of seaworthiness was also owed by the owner to the seamen employed by the vessel. What has mattered was that the worker was aboard a vessel "doing a seaman's work and incurring a seaman's hazards." *Id.* An independently employed worker doing the ship's work with the consent of the owner became the beneficiary of the warranty of seaworthiness not because he was independent of the shipowner, but in spite of that fact. *See id.* ("[T]he stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner.").

The question in *Sieracki* was "whether the obligation of seaworthiness, traditionally owed by an owner of a ship to seamen, extends to a stevedore injured while working aboard the ship." *Id.* at 87. The shipowner's argument against the imposition of a warranty of seaworthiness in favor of an independently employed

11

stevedoring worker was that "the obligation flows from, and is circumscribed by the existence of, the contract between the owner of the vessel and the seaman," *id.* at 90, and that no such contract binds the owner to a worker employed by an independent entity. The Court rejected the proposition that obligation flowed from the contractual relationship. "[C]onsiderations arising from the hazards which maritime service [which historically included the loading and unloading of vessels, *id.* at 96,] places upon men who perform it, rather than any consensual basis of responsibility, have been the paramount influences dictating the shipowner's liability for unseaworthiness as well as its absolute character." *Id.* at 94. The Court rejected the notion that ship owners could escape their responsibility to those who performed the ship's work simply by contracting with independent entities for its performance. *See id.* at 95.

Nothing in the logic of *Sieracki* or its progeny has suggested that, while workers employed by an independent stevedoring contractor may recover from the shipowner for unseaworthy conditions, workers employed by a shipowner in its own land-based stevedoring operation may not. *See id.* at 90 ("There could be no question of [shipowner's] liability for [worker's] injuries, incurred as they were

12

here, if he had been in [shipowner's] employ rather than hired by the stevedoring company."). And we are not aware of any Supreme Court or circuit court ruling that has conditioned *Sieracki* seaman status on an independent contractor relationship to the vessel.

The Fire District contends that the district court's ruling is supported by the Fifth Circuit's opinion in *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811 (5th Cir. 2020). In *Rivera*, a harbor pilot engaged by a vessel to guide it through the waters of Corpus Christi Harbor brought an unseaworthiness claim against the ship owner for his injury resulting from a fall when he tripped on a poorly illuminated step leading to the wheelhouse. *Id.* at 815–16. The *Rivera* court held that the plaintiff could maintain his unseaworthiness claim under *Sieracki* because, being an independent contractor employed by no one, he could not be "a person covered under" the LHWCA, as the very purpose of that Act was to require employers to pay no-fault compensation benefits to their employees. If he was not a covered person, then the Act's abrogation of the *Sieracki* unseaworthiness remedy did not apply to him.

13

The Fire District contends that the *Rivera* plaintiff was entitled to bring a *Sieracki* claim *because* he was an independent contractor. The *Rivera* opinion, however, did not suggest that independent contractor status is essential to being *uncovered* by the Act. The relevant issue for us is whether Dyckman was covered by the Act. Dyckman, as explained below, is not covered by the Act because he is a governmental employee. Because he is excluded as a governmental employee, the fact that he is neither an independent contractor nor employed by one is of no significance as to whether he is or is not covered under the Act.

Nor do we agree that a requirement of independent contractor status is supported by *Radut v. State Street Bank & Trust Co.*, No. 03-CV-07663, 2004 WL 2480467 (S.D.N.Y. Nov. 4, 2004). The *Radut* court rejected the defendant-shipowner's motion for summary judgment, holding that plaintiff, an independent contractor, was owed the duty of seaworthiness pursuant to *Sieracki* because he was "performing the ship's service, at the owner's request." *Id.* at *1, *4. The Fire District, arguing in support of the district court's ruling, emphasizes the *Radut* court's statement that "[t]he *Sieracki* doctrine was developed precisely for independent contractors who do the ship's work and are exposed to the ship's

hazards, but are not members of the ship's crew or under the direction of its officers." *Id.* at *3. We disagree with the Fire District's reading of the ruling; the court determined that Radut was entitled to claim as a *Sieracki* seaman because he was exposed, like the members of the ship's crew, to the ship's hazards, not because he was an independent contractor. *Id.* at *4 ("The undisputed facts establish [plaintiff's] status as a *Sieracki* seaman: [plaintiff] worked, slept and ate alongside the crew; he went to sea with the ship; he was exposed to the same hazards as the crew; and, most importantly, he was performing the ship's service, at the owner's request." (footnote omitted)).[4]

*Sieracki* expanded the scope of those to whom the warranty of seaworthiness was owed. In so doing, it did not limit its reach to independent contractors. It has been repeatedly said that entitlement to the warranty of seaworthiness depends on the factual circumstances of a person's work and injury. *See Pope & Talbot*, 346 U.S. at 412–13 ("Sieracki's legal protection was not based on the name 'stevedore' but on the type of work he did and its relationship to the ship and to the historic

---

[4] In any event, even if the district court's reading of *Radut* were correct, as a district court ruling, *Radut* would not be controlling. *United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 138 (2d Cir. 2024).

doctrine of seaworthiness. . . . [Both seamen and stevedores] were subjected to the same danger. All were entitled to like treatment under law."); *Shenker v. United States*, 322 F.2d 622, 626 (2d Cir. 1963) ("The answer to the question of whether libelant [is owed] . . . 'the absolute right to a seaworthy ship' . . . depends upon the character of the work he was performing." (citations omitted). "Historically the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew." *Sieracki*, 328 U.S. at 96. In sum, a *Sieracki* seaman is one "doing a seaman's work and incurring a seaman's hazards," *Sieracki*, 328 U.S. at 99, or, as we have sometimes said, "perform[ing] the ship's service . . . with [the owner's] consent or by his arrangement." *Mahramas v. Am. Exp. Isbrandtsen Lines, Inc.*, 475 F.2d 165, 169 (2d Cir. 1973) (quoting *Sieracki*, 328 U.S. at 95).

We conclude that the district court erred in reasoning that Dyckman was ineligible for *Sieracki* seaman status by reason of the fact that he was employed by the shipowner, rather than being an independent contractor or employed by one.

## B. Whether *Sieracki* Seaman Status Is Available to Land-Based Workers

We conclude likewise that the district court erred in reasoning that *Sieracki* and the warranty of seaworthiness "was not intended to include land-based workers like [Dyckman]." *Verplanck Fire District*, 687 F. Supp. 3d at 392 (citing *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348 (1991)). The district court relied on the Supreme Court's statement in *Wilander* that "[w]hether under the Jones Act *or general maritime law*, seamen do not include land-based workers." 498 U.S. at 348 (emphasis added).[5] While the statement was accurate and part of the Court's holding *to the extent it referred to the Jones Act*, to the extent that it could be read to refer to the meaning of "seaman" under *Sieracki*, the statement had no role in the Court's decision and was dictum.

---

[5] Prior to this statement, the Supreme Court stated that in response to *Sieracki*, Congress passed the 1972 Amendments to the LHWCA. *Wilander*, 498 U.S. at 348. Whether and to what extent the *Sieracki* ruling was abrogated by the 1972 Amendments to the LHWCA is addressed *infra* in Part I.D.

17

The Supreme Court was addressing whether a paint foreman was a "seaman" under the Jones Act.[6] *Id.* at 339–40. After considering the meaning of "seaman" in general maritime law around the time of the Jones Act, the Court explained that, "[w]ith the passage of the LHWCA, Congress established a clear distinction between land-based and sea-based maritime workers." *Id.* at 347. Before the passage of the LHWCA, courts interpreted "seaman" broadly to include longshoremen under the Jones Act. *Id.* The LHWCA made clear that those who did not "owe their allegiance to a vessel" but instead "solely to a land-based employer" were no longer "seamen" under the Jones Act. *Id.* This distinction

---

[6] The Supreme Court was addressing whether a paint foreman generally assigned to a vessel (the *Gates Tide*) which provided painting services to ocean oil drilling platforms was a seaman under the Jones Act. *Wilander*, 498 U.S. at 337. It held that it was time to "jettison the [previously employed] aid in navigation" criterion when evaluating whether an employee meets the definition of "seaman" under the Jones Act. *Id.* at 354. Instead, the Court held that the relevant inquiry required evaluating "the employee's connection to a vessel in navigation," *id.* at 353, while noting that "[t]he LHWCA provides relief for land-based maritime workers, and the Jones Act is restricted to 'a master or member of a crew of any vessel,'" *id.* at 347. Although the jury had found as a factual matter that Wilander was a seaman, the Supreme Court declined to opine on whether he was a seafaring seaman under the Jones Act or a land-based maritime worker under *Sieracki* because it was "not asked to determine if the jury could reasonably have found that Wilander had a sufficient connection to the *Gates Tide* to be a 'seaman' under the Jones Act." *Id.* at 356. The Court restricted its holding to the narrow question whether "Wilander should be precluded from seaman status because he did not perform transportation-related functions on board the *Gates Tide*." *Id.* at 357.

18

between land-based and sea-based workers contributed to the development of the requirements for a "seaman" to recover under the Jones Act. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 358 (1995). In *Wilander*, the Court did not rule on an entitlement to an unseaworthiness remedy under general maritime law. It ruled only on seaman status under the Jones Act.

Far from limiting seaman status to sea-based workers, *Sieracki* explicitly extended the duty of seaworthiness to land-based longshore workers. *See Sieracki*, 328 U.S. at 90. Indeed, in dissenting from the *Sieracki* ruling, Chief Justice Stone criticized the majority for failing to give importance to the difference between historical seamen, afforded the warranty of seaworthiness, and "land workers," such as longshore and harbor workers, to whom *Sieracki* extended protection. *Sieracki*, 328 U.S. at 105 (Stone, C.J., dissenting); *see id.* at 105–07 (contrasting *Sieracki*'s expansion of the warranty of seaworthiness with Congress's division of rights allocated between the LHWCA and the Jones Act). What mattered to the majority in *Sieracki* was neither the worker's title nor the nature of his employer but whether the worker was "doing a seaman's work and incurring a seaman's hazards." *Sieracki*, 328 U.S. at 99 (majority opinion); *see Pope & Talbot*, 346 U.S. at

412–13. We therefore disagree with the district court that the status of *Sieracki* seaman is not available to land-based workers.

### C. Whether *Sieracki* Seaman Status Is Reserved to Those Whose Work Is Primarily to Aid in Navigation

The district court's third reason for disqualifying Dyckman from eligibility for *Sieracki* seaman status was that he was not primarily aiding in navigation. *Verplanck Fire District*, 687 F. Supp. 3d at 392 n.7. The district court relied for this conclusion on two old decisions of our circuit. *See Klarman v. Santini*, 503 F.2d 29, 33 (2d Cir. 1974); *Harney v. William M. Moore Bldg. Corp.*, 359 F.2d 649, 654 (2d. Cir. 1966); *see also Conklin v. Specialist, LLC*, No. 16-CV-2515, 2017 WL 4480187, at *2 (S.D.N.Y. Oct. 6, 2017). We read those decisions differently.

Although it is true that those cases considered claims under both the Jones Act and the general maritime law, our court's statements on which the district court relied referred only to the Jones Act claim.[7] *See Klarman*, 503 F.2d at 33;

---

[7] As for seamen under the Jones Act, the Supreme Court has since modified the legal standard, now derived from *Wilander* and *Chandris*. *See Chandris*, 515 U.S. at 357 (describing *Wilander* as "dispensing with the 'aid to navigation' requirement"); *id.* at 376 (outlining the test for determining a Jones Act seaman as "[t]he worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the worker must have a connection to a vessel

20

*Harney*, 359 F.2d at 654. They had no bearing on whether a worker could be entitled to *Sieracki* seaman status if his work had no relationship to the navigation of the ship. Although the parties do not fully address this issue, we conclude that a worker need not aid in navigation in order to qualify as a *Sieracki* seaman.[8] In any event, those rulings of our circuit preceded the Supreme Court rulings in *Wilander* and *Chandris*, which abandoned reliance on whether seafaring seaman status was restricted to those who aided in navigation. *Wilander*, 498 U.S. at 353 ("We think the time has come to jettison the aid in navigation language."); *Chandris*, 515 U.S. at 350 ("[U]nder the Jones Act, a seaman's job need not be limited to transportation-related functions that directly aid in the vessel's navigation.").

---

in navigation (or an identifiable group of vessels) that is substantial in terms of both its duration and its nature").

[8] For the same reasons, and except insofar as it includes whether the plaintiff was exposed to a "seaman's hazards," the rest of the standard the district court recites also has no bearing on whether a worker is a *Sieracki* seaman. *See Verplanck Fire District*, 687 F. Supp. 3d at 392 n.7 (quoting *Conklin*, 2017 WL 4480187, at \*2).

## D. Whether a *Sieracki* Seaman's Remedy for Unseaworthiness Survives the 1972 Amendments to the LHWCA for Workers Not Covered by That Act

While we reject the reasons given by the district court for denying Dyckman *Sieracki* seaman status, it does not necessarily follow that he was entitled to a *Sieracki* remedy for unseaworthiness. In fact, there is a question whether the *Sieracki* seaman status survived following Congress's amendments to the LHWCA in 1972. There is a Circuit conflict on that question. And on a number of occasions, the Supreme Court (and other courts including ours) have made ambiguous statements about the scope of the 1972 Amendments' abolition of the unseaworthiness remedy.

The Fire District has not argued that the *Sieracki* remedy for unseaworthiness was abolished by the Amendments. In fact, it seems to have conceded in its brief that the 1972 Amendments did not abrogate *Sieracki* for previously eligible land-based (i.e., non-seamen) workers.[9] In the 1972

---

[9] The Fire District's brief states, "Although Congress invalidated the holding of *Sieracki* as it applied to 'longshoremen,' [t]he LHWCA left a class of *Sieracki* seamen who fall into the crack between seamen and longshore workers who may assert a claim for unseaworthiness though they are not covered by the Jones Act." Appellee's Br. at 22 (quoting *Radut v. State St. Bank & Trust Co.*,

Amendments, Congress substantially abrogated the *Sieracki* remedy, making workers who were eligible for benefits under the LHWCA, such as longshore workers in private employment, no longer eligible for the *Sieracki* unseaworthiness claim.

However, not all of the non-seamen who worked on ships and had been eligible for the *Sieracki* remedy were covered by the LHWCA. For example, the Act, in what is now § 903(b), denies coverage to governmental workers. That section provides, "No compensation shall be payable in respect of the disability or death of an officer or employee of the United States, or any agency thereof, or of any State or foreign government, or any subdivision thereof."[10] 33 U.S.C. § 903(b).

Dyckman, being employed as a volunteer fireman by the hamlet of Verplanck, is an employee of a subdivision of a state government. He falls into a category of workers that is ineligible for compensation under the LHWCA.

---

2004 WL 2480467, at *3 n. 36, 2005 A.M.C. 413 (S.D.N.Y. 2004)) (some internal quotation marks deleted).

[10] *See* LHWCA, § 3(a)(2), 44 Stat. at 1426 (current version at 33 U.S.C. § 903(b)); LHWCA, §§ 2(c), 21, 86 Stat. at 1251, 1265 (current version at 33 U.S.C. § 903(b)).

The district court, having ruled for the reasons set forth above, did not address whether the *Sieracki* remedy survived the Amendments for land-based workers in governmental employment, a category that is not covered by the Act.

Despite the Fire District's concession, given the Circuit conflict and the Supreme Court's ambiguous statements, we think it appropriate to consider the question whether the *Sieracki* remedy for unseaworthiness survived the Amendments for any land-based non-seamen who work on ships. In the ordinary course, under these circumstances, a court must endeavor to interpret a statute correctly and therefore may not properly base its understanding of a statute on the concession of a party. We begin by exploring the purpose and history of the LHWCA and the 1972 Amendments.

The "LHWCA is a comprehensive [federal] workers' compensation system, under which employers are required to compensate covered employees injured in the course of their employment, regardless of fault." *Gravatt*, 226 F.3d at 115. Certain categories of workers are excluded from the LHWCA's coverage. The excluded categories include, but are not limited to, the "master or member of a

crew of any vessel," *see* 33 U.S.C. § 902(3)(G), and governmental employees, *see id.* § 903(b).

Masters or members of the crew may bring suit against their employer for damages under the Jones Act, which creates a cause of action for "seamen." *See O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 63 (2d Cir. 2002) ("Only seamen are entitled to sue for damages under the Jones Act." (internal quotation marks and citation omitted)). Courts have treated the Jones Act and the LHWCA as "mutually exclusive compensation regimes," *Chandris*, 515 U.S. at 355–56, wherein "[t]he LHWCA provides relief for land-based maritime workers, and the Jones Act is restricted to 'a master or member of a crew of any vessel,'" *Wilander*, 498 U.S. at 347 (quoting *Swanson v. Marra Bros., Inc.*, 328 U.S. 1, 6 (1946)).

Since its enactment, the LHWCA has limited the liability of employers whose workers are covered under the Act by providing that its "statutory, no-fault compensation payments are the employer's exclusive liability to its employees when they are injured in the course of their employment." *Gravatt*, 226 F.3d at 115; *see also* 33 U.S.C. § 905(a) ("The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to

the employee . . . ."). However, the LHWCA then permitted and still authorizes an employee to sue negligent third parties, including the vessel. *See* 33 U.S.C. § 933(a) ("If . . . the person entitled to . . . compensation determines that some person other than the employer . . . is liable in damages, he need not elect whether to receive such compensation or to recover damages against such third person."); *see also Gravatt*, 226 F.3d at 115.

The *Sieracki* ruling, together with *Ryan Stevedoring Co. v. Pan–Atlantic Steamship Corp.*, 350 U.S. 124, 132–35 (1956), indirectly undermined the exclusivity of employers' liability under the LHWCA. *Sieracki* extended a vessel's obligation of seaworthiness to a longshoreman if the longshoreman was "doing a seaman's work and incurring a seaman's hazards," 328 U.S. at 99, regardless of whether that worker was also entitled to an LHWCA remedy against his employer. Shortly thereafter, the Supreme Court held that a shipowner could seek reimbursement from its stevedoring contractor for damages it had paid to the contractor's employee for injuries the employee had incurred due to the unseaworthiness of the vessel. *Ryan*, 350 U.S. at 132–35. In short, *Sieracki* and *Ryan* enabled an injured stevedoring employee, indirectly, to "get tort damages from his employer despite

26

the [LHWCA's] statutory proscription against suing his employer directly."
*Gravatt*, 226 F.3d at 116.

In passing the 1972 Amendments, Congress noted that the benefits payable under the LHWCA had fallen substantially behind increases in the cost of living. A major purpose of the Amendments was to increase those benefits, which would add significantly to the expenses of the employers of covered workers. Congress explained in the House Report that the Amendments were designed to effectuate a bargain. Covered workers would receive substantially increased benefits, and in compensation, the covered workers would give up the unseaworthiness remedy.[11] *See Howlett*, 512 U.S. at 97. This in turn eliminated the vessel owner's indemnity action, under *Ryan*, against the stevedoring firm. The 1972 Amendments achieved

---

[11] *See* H.R. Rep. No. 92-1441, at 1 (1972). While "employer groups indicated their willingness to increase worker benefits," *id.*, employers also advocated that after *Sieracki* and *Ryan*, "much of the financial resources which could better be utilized to pay improved compensation benefits were now being spent to defray litigation costs," *id.* at 5. The House Report thus stated that workers "covered under the Act" should no longer be able to bring an action against a vessel for unseaworthiness, "especially with the vast improvement in compensation benefits which the bill would provide." *Id.*

that modification of the preexisting *Sieracki-Ryan* framework through the addition

of section 905(b) to the LHWCA. Section 905(b) provided, in pertinent part:

> In the event of injury to a person *covered under this Act* caused *by the negligence of a vessel*, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . , and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel.[12] *The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness* or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act.

LHWCA, Pub. L. No. 92-576, § 18(a), 86 Stat. 1251, 1263 (1972) (current version at

33 U.S.C. § 905(b)) (emphases added).[13]

---

[12] Note that the preceding sentences were substantially further amended by the 1984 Amendments, further limiting the liability of the vessel to certain workers covered by the Act in a manner not pertinent to this case. *See Gravatt*, 226 F.3d at 117.

[13] The version of the Act in effect today states:

> In the event of injury *to a person covered under this chapter* caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason

The crucial sentence of this paragraph for our purposes states, "The liability of the vessel *under this subsection* shall not be based upon the warranty of seaworthiness . . . ." *Id.* (emphasis added). The sentence does not negate the warranty of seaworthiness for all purposes or to all workers. It expressly limits its scope to "liability of the vessel under this subsection." *Id.* The subsection's scope is limited to "the event of injury to *a person covered under this Act*." *Id.* (emphasis added). Accordingly, pursuant to this provision of the Amendments, a person who was "covered under [the LHWCA]" could no longer recover against the vessel for unseaworthiness. *Id.* The vessel could be liable to such person for negligence, but not for unseaworthiness. However, the availability of the warranty of seaworthiness to a person *not* covered under the 1972 Amendments, such as a seaman, *see* 33 U.S.C. § 902(3)(G), a governmental worker, *see* § 903(b), or another excluded category, remains unchanged.

---

thereof, may bring an action against such vessel as a third party . . . , and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b) (emphasis added).

29

(i)    *Ambiguous Precedents*

On a number of occasions, in explaining the effects of the 1972 Amendments, the Supreme Court (and our court) made statements, without any caveat, to the effect that the Amendments abolished the unseaworthiness remedy for longshoremen.[14] (The references to "longshoremen" were undoubtedly meant

---

[14] *See, e.g.*, *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 97 (1994) (explaining that, where a plaintiff covered under LHWCA filed suit against the vessel owner and operator, the 1972 Amendments "abolished the longshoreman's pre-existing right to sue a shipowner based upon the warranty of seaworthiness"); *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 348 (1991) ("In 1972, Congress amended the LHWCA to bar longshore and harbor workers from recovery for breach of the duty of seaworthiness."); *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 198 (1983) (explaining that the 1972 Amendments "abolished the injured employee's seaworthiness remedy against the shipowner); *Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Perini N. River Assocs.*, 459 U.S. 297, 321 (1983) (explaining that the purpose of the 1972 Amendments "involved the elimination of a strict liability unseaworthiness remedy against a vessel owner afforded to longshoremen by [*Sieracki*]"); *Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 616 (1981) (explaining that under the 1972 Amendments "the shipowner's nearly absolute liability for unseaworthiness was eliminated"); *Bloomer v. Liberty Mut. Ins. Co.*, 445 U.S. 74, 83 (1980) (where a longshoreman covered under the LHWCA filed suit, stating that "Congress abolished the unseaworthiness remedy for longshoremen, recognized in [*Sieracki*], and limited the longshoreman's action against the shipowner to one based on negligence"); *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 165, 172 (1981) (reasoning in part that under the 1972 Amendments the shipowner was not liable based on "congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty" and further explaining that the 1972 Amendments abolished "the longshoreman's right to recover for unseaworthiness"); *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 724 (1980) (reasoning that "the *quid pro quo* to the employers for the landward extension of the LHWCA by the 1972 amendments was simply abolition of the longshoremen's unseaworthiness remedy"); *P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 73 n.3 (1979) (one of the purposes of the 1972 Amendments was to "abolish the longshoremen's seaworthiness remedy against the owners of a vessel"); *Edmonds v. Compagnie*

as a shorthand for the various categories of land-based workers on ships who were covered by the LHWCA, the great majority of whom were longshoremen). At least in some cases, these statements, if read in isolation and not in context, are ambiguous. They could be read to carry the broader meaning that the unseaworthiness remedy was categorically abolished for all land-based workers. Because these statements were made either in the context of explaining the effects of the 1972 Amendments, or of explaining the unavailability of a claim for unseaworthiness to a plaintiff who was covered by the 1972 Amendments, however, we think the most natural reading of those statements is that the 1972 Amendments abolished the unseaworthiness remedy only *for workers covered by the Amendments*, and not that the unseaworthiness remedy was abolished for all land-based workers on ships, regardless of whether they were covered by the LHWCA. We explain our reasons for construing the ambiguous statements as intending this narrower meaning.

---

*Generale Transatlantique*, 443 U.S. 256, 262 (1979) (same); *see also Gravatt v. City of New York*, 226 F.3d 108, 116 (2d Cir. 2000) (stating that, under the 1972 Amendments, the "longshoreman-employee's right to recover for unseaworthiness was abolished").

Our first reason is that, on at least one occasion, the Supreme Court described the change brought about by the 1972 Amendments precisely, specifying that the enactment "eliminated *covered* workers' unseaworthiness claims against a vessel." *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 819 (2001) (emphasis added). This was said without any suggestion that its message differed from the meaning intended by the arguably broad ambiguous statements about the abolition of the remedy for all longshoremen. Nor have any of the opinions setting forth the ambiguous statements suggested that their meaning differed from what the Court said in *Norfolk Shipbuilding* when it spoke precisely of the impact of the 1972 Amendments on covered workers. This suggests that, notwithstanding the ambiguous statements of broad abolition, the Court never retreated from the narrow meaning it ultimately stated in *Norfolk Shipbuilding.*

Second, if the Supreme Court had meant that the enactment accomplished something so clearly different from what the text appears to say, and so clearly inconsistent with Congress's explanations of its intentions in its Congressional Report, we would expect that the Supreme Court would have expressly

32

acknowledged the tension and explained the reasons for its interpretation. As noted above, Congress clearly explained in the House Report that its abolition of the unseaworthiness remedy for workers covered by the 1972 Amendments was intended to achieve a balance with the substantial increases in benefits payable to covered workers.[15] If the Supreme Court had intended by its ambiguous statements also to abolish the unseaworthiness remedy for workers who were not covered by the Amendments and therefore had received no increased benefits, we would expect the Court to acknowledge the tension and explain its reasons. But, in our view, the Supreme Court did not so hold because no such acknowledgment or explanation appears in its opinions.

Yet, in *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190 (1983), the Supreme Court expressly considered this tension and relied on the bargain struck by Congress in the 1972 Amendments to the LHWCA when evaluating whether a third-party indemnity cause of action remained in the statutory scheme at issue. In that case, the Supreme Court reviewed the indemnity provision of a worker's

---

[15] *See* discussion of H.R. Rep. No. 92-1441, at 1 (1972) in n. 12.

compensation scheme deemed "nearly identical" to the LHWCA. *Id.* at 195. The Court explained in dicta that the 1972 Amendments to the LHWCA included a *quid pro quo* bargain under which shipowners lost the right to bring a third-party indemnity action previously available under *Ryan* but benefited from the abolition of the unseaworthiness remedy against shipowners. *Id.* at 198. Since no similar bargain was in place providing a commensurate benefit to third parties in the similar statutory scheme at issue, the Court declined to "abolish the third-party indemnity action." *Id.* Such reasoning strongly suggests to us that the Supreme Court presumed that only parties deemed within the scope of the bargain enshrined in the 1972 Amendments, including covered workers, could be affected by the loss of both the *Ryan* indemnity and the *Sieracki* unseaworthiness remedy.

For those reasons, it seems to us highly unlikely that the Supreme Court intended the broader reading of those ambiguous statements regarding the abolition of the unseaworthiness remedy. It seems far more likely that, in saying repeatedly that the 1972 Amendments abolished the unseaworthiness remedy, the Court meant only that the Amendments abolished the remedy for covered

workers, and not land-based non-seamen who were excluded by the 1972 Amendments from coverage by the LHWCA.

(ii)    *The Circuit conflict.*

We turn to the fact that, in the very rare instances in which the question of the survival of *Sieracki* for persons not covered under the LHWCA has been directly litigated, circuits have reached differing conclusions.

The Fifth Circuit in *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. Unit A Apr. 1981), considered the question whether land-based harbor workers "do[ing] sailor's work aboard ships" could recover for injuries allegedly caused by vessels' unseaworthiness if they were employed by a federal agency and thus not covered under the LHWCA. *Id.* at 1110. The court ruled, in accordance with the terms of § 905(b), that, for government employees who are not covered by the LHWCA, the *Sieracki* remedy for unseaworthiness remains available, as does the ship's entitlement to indemnification under *Ryan*. *Id.* at 1118. The court reasoned most importantly that the express language of Section 905(b) limits its applicability to "person[s] covered under this Act." *Id.* at 1116 n.11 (internal quotation marks omitted) (quoting LHWCA, § 18(a), 86 Stat. at 1263). The court noted also that §

905(b)'s limitation on the scope of the abrogation of the *Sieracki* remedy is bolstered by the House Report's discussion of the bargain that justified the limitation. *See id.*

The D.C. Circuit reached the same conclusion. In *Eagle-Picher Industries, Inc. v. United States*, manufacturers sought indemnification for litigation expenses regarding federally employed shipyard workers. 937 F.2d 625, 627 (D.C. Cir. 1991). The D.C. Circuit concluded that Section 905(b) abrogated *Sieracki* and *Ryan* only with respect to injuries to persons covered under the LHWCA. *Id.* at 632. The court agreed with the reasoning of the Fifth Circuit, reading the plain language of the statute and emphasizing that the federal workers in question did not receive increases in benefits comparable to those given by Congress in the 1972 Amendments to workers covered by the LHWCA. *Id.*

In contrast, the Ninth Circuit in *Normile v. Maritime Co. of the Philippines*, 643 F.2d 1380, 1381 (9th Cir. 1981), held that a longshore worker, regardless of whether publicly or privately employed, could no longer bring an unseaworthiness action following the 1972 Amendments. The court gave the following reasons.

First, it concluded that because the extension of the *Sieracki* right to public employees had been an addition by the lower courts to the Supreme Court's

original *Sieracki* ruling (which had benefited privately employed stevedoring workers), Congress's elimination of the basic *Sieracki* right in the 1972 Amendments left nothing to which an analogous right for public employees could be added. *Id.* at 1381–82. "There remains no viable precedent to which plaintiff public employee can analogize." *Id.* at 1382. While it is clear, without question, that, for workers covered under the Act, the *Sieracki* remedy against the vessel has been abrogated by the 1972 Amendments, *see Mahramas*, 475 F.2d at 169 n.4 ("It should be noted . . . that effective November 26, 1972, employees *covered by* the [LHWCA] may no longer bring an action against the shipowner for unseaworthiness." (emphasis added) (citation omitted)), neither the Supreme Court nor this court has ruled on the question whether the *Sieracki* remedy remains viable for a worker *not covered* under the Act.

The court continued, "[E]ven if the 1972 Amendments were construed to leave *Sieracki* standing but largely circumscribed," Section 905(b)'s restriction on the reach of its abrogation to persons covered under the Act should not be viewed as having been intended by Congress.

> [It did] not mean that the precedent which those Amendments
> attacked, although technically still standing, should be followed.
> Given that the 1972 Amendments have eviscerated if not eliminated
> *Sieracki*, we decline to consider it binding.

*Normile*, 643 F.2d at 1382. The court found support for its interpretation in a sentence from the House Report to the effect that "a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores *subject to this Act*, for the manner or method in which stevedores or employees of stevedores *subject to this Act* perform their work, . . . or for other categories of unseaworthiness which have been judicially established." *Id.* at 1382–83 (quoting H.R. Rep. No. 92-1441, at 6 (1972)) (emphases added). Finally, the court reasoned that the "tenor of the report evidences a desire for uniformity in the treatment of all longshoremen." *Id.* at 1383.

We do not find any of the Ninth Circuit's many reasons to be persuasive. First, nothing in the reasoning of the original *Sieracki* opinion suggested that the creation of the new right extending the warranty of seaworthiness to independently employed non-seamen depended on privately employed status, so that the decision might have been otherwise if that longshoreman had been

employed by a municipality or a federal or state agency. What mattered was that the plaintiff was "doing a seaman's work and incurring a seaman's hazards." *Sieracki*, 328 U.S. at 99.

As for the proposition that nothing of the *Sieracki* remedy remained after the 1972 Amendments to which the extension of the right to public employees could be added, it is inaccurate. Prior to the 1972 Amendments, private and public non-seamen doing seamen's work on ships were entitled to the *Sieracki* remedy to bring a claim for unseaworthiness. After the Amendments took effect, the public employees remained entitled, while the privately employed ones did not. The *Sieracki* concept remained viable, notwithstanding that most of the workers previously entitled to it were no longer entitled.

As for the Ninth Circuit's notion that Congress had not really intended to leave part of the *Sieracki* right still viable, this seems to us to disregard Congress's repeated insistence in both the words of § 905(b) and the accompanying House Report, confining the abrogation to persons covered by the Act.[16] The Ninth

---

[16] *See* discussion of H.R. Rep. No. 92-1441, at 1 (1972), *supra* n. 12.

Circuit's reasoning disregards Congress's stated reasons for so limiting the scope of the abrogation, which depended on the fact that, under the Amendments covered employees would receive, and their employers would be compelled to pay for, substantial increases in the benefits payable under the Act, which justified eliminating the benefit to workers and the burden to employers of the *Sieracki* remedy. *Id.* The revocation as to private employees was part of a bargain: they were given more generous no-fault compensation benefits under the amendments but in exchange lost access to the *Sieracki* remedy. *Id.* Public employees did not receive the increase in no-fault compensation benefits implemented by the Amendments that constituted one side of the bargain. We can see no basis for the Ninth Circuit's perception that § 905(b) left the *Sieracki* remedy only "technically" standing.

As for the Ninth Circuit's expansive reading of the House Report's use of the term "other categories of unseaworthiness" (reading it to contradict Congress's oft repeated limitation of the provision to "persons covered under the Act"), this more logically referred to the *Sieracki* rights of privately employed workers in

shipbuilding, ship breaking, and ship repair, who were treated identically with workers providing stevedoring services under § 905(b).

And as for the Ninth Circuit's perception that the House Report "evidences a desire for uniformity in the treatment of all longshoremen," we think this is a misreading. In view of the repeated insistence in § 905(b) and the House Report that its provisions apply to "persons covered under this Act," as well as Congress's explanation of its reasons as relating to the expansion of benefits provided by the Act, it appears that Congress did indeed desire uniformity—not for all workers in stevedoring, but rather for all workers covered under the LHWCA.

For all the reasons explained above we agree with the Fifth and D.C. Circuits. We conclude that the *Sieracki* remedy survived the 1972 Amendments to the LHWCA for workers, including those in governmental employment, who, under §§ 902 and 903(b), were excluded from the benefits provided by the Act.

### E. Whether Dyckman Can Qualify as a *Sieracki* Seaman

It is undisputed that Dyckman, an employee of a subdivision of the State of New York, is not covered by the LHWCA. *See* 33 U.S.C. § 903(b) ("No compensation shall be payable in respect of the disability or death of an officer or

employee of the United States, or any agency thereof, or of any State or foreign government, or any subdivision thereof."). Because we conclude that the LHWCA does not abolish the *Sieracki* cause of action for a person who is not covered under the Act, we find that Dyckman may maintain his unseaworthiness claim if he meets the other requirements of *Sieracki*.

On remand, the district court should further develop the record as to whether, among other issues, Dyckman satisfies the requirements for *Sieracki* seaman status—whether he was "doing a seaman's work and incurring a seaman's hazards." *Sieracki*, 328 U.S. at 99. Those issues were not adjudicated on summary judgment. As noted above, the Fire District sought summary judgment on different grounds, making no argument that Dyckman was not doing a seaman's work and incurring a seaman's hazards. Dyckman's response focused on rebutting the Fire District's arguments and made only passing reference to how he qualified. He did not cross-move for partial summary judgment to settle the question whether he was doing a seaman's work and incurring a seaman's hazards. We leave the question to be settled on remand.

## II.  Negligence Under General Maritime Law

Dyckman also challenges the district court's denial of his claim for negligence under the general maritime law. The district court so ruled because the New York Volunteer Firefighters' Benefit Law, pursuant to which Dyckman was receiving compensation benefits, provides that its remedies are exclusive of all others against the employer. Dyckman argues that, notwithstanding the statute's exclusivity provision, the Supremacy Clause of the Constitution requires that such a provision of state law not be construed to bar a remedy provided by federal maritime law. The issue presents a troublesome question of federalism on which circuits have not been consistent or unanimous.

### A. The New York Volunteer Firefighters' Benefit Law and the Evolution of Federalism as to Claims in Admiralty in the Supreme Court

The exclusivity provision of the New York Volunteer Firefighters' Benefit Law states in pertinent part:

> The benefits provided by this chapter shall be the exclusive remedy of a volunteer firefighter, . . . at common law or otherwise, for or on account of an injury to a volunteer firefighter in line of duty or death resulting from an injury to a volunteer firefighter in line of duty, as against (1) the political subdivision liable for the payment of such benefits . . . .

43

N.Y. Vol. Fire. Ben. L. § 19. For purposes of the Volunteer Firefighters' Benefit Law, the Fire District is the political subdivision liable for the payment of benefits. *See id.* § 3(10) ("'Political subdivision' means a county, city, town, village or fire district.").[17]

The issue of "federalism in admiralty and the scope of application of state law in maritime cases" has been described by the Supreme Court as "one of the most perplexing . . . in the law." *Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 70 (2024) (internal quotation marks omitted) (quoting T. Schoenbaum, 1 Admiralty & Mar. Law § 4:4 (6th ed. 2018)); *see also Newburgh Land & Dock Co. v. Tex. Co.*, 227 F.2d 732, 734 (2d Cir. 1955) (Hand, J.) ("So far as we can see, there is no clue in the opinions as to how far the state law may invade the maritime law to call up 'the spectre of a lack of uniformity' which is thought to be so essential to that law."). The Supreme Court has taken a tortuous path in adjudicating problems of federalism in maritime law.

---

[17] At oral argument, the Fire District waived any contention that the New York Volunteer Firefighters' Benefit Law also bars Dyckman's unseaworthiness claim under *Sieracki*. *See* Oral Argument Audio Recording at 23:22–24:14. We therefore address only whether this law bars Dyckman's claim for general maritime negligence.

The Constitution grants federal courts the "authority to create and apply maritime law . . . [in] 'all Cases of admiralty and maritime Jurisdiction.'" *Great Lakes Ins. SE*, 601 U.S. at 69 (quoting U.S. Const. art. III, § 2, cl. 1). "That grant of jurisdiction contemplates a system of maritime law 'coextensive with, and operating uniformly in, the whole country.'" *Id.* (quoting *Norfolk S. R. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 28 (2004)). Article VI, clause 2 of the Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S. Const. art. VI, cl. 2. Furthermore, since the Judiciary Act of 1789, the federal courts have had jurisdiction, exclusive (with exceptions) of the courts of the States, of civil cases seeking maritime remedies. *See* 28 U.S.C. § 1333.[18] It is well established, and the parties are in agreement, that a maritime personal injury dispute falls within the admiralty and maritime jurisdiction of the federal courts. *See Leathers v. Blessing*, 105 U.S. (15 Otto) 626, 630 (1881); 28 U.S.C. § 1333.

---

[18] "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333.

A need for uniformity is a persistent principle of maritime law. Over 100 years ago, the Supreme Court underscored its importance in admiralty jurisprudence in *Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917). In that case, the widow of a stevedore who was fatally injured while doing maritime work was awarded compensation under a state workers' compensation statute. *Id.* at 209. The deceased stevedore's employer objected to the award of compensation. *Id.* While the state workers' compensation statute relieved an employer from further liability if the employer paid the prescribed compensation, *id.* at 211, the employer argued that the state provision for compensation was not enforceable because the Constitution and the civil code gave Congress the exclusive power to make all necessary laws concerning (and gave federal courts exclusive jurisdiction over) matters of maritime and admiralty jurisdiction.[19] *Id.* at 210. The *Jensen* Court agreed, holding that the state compensation statute was an unconstitutional trespass on exclusively federal territory. *Id.* at 217–18. No state legislation, the

---

[19] The Supreme Court interpreted the "necessary and proper" clause of Article I, section 8, clause 18 of the Constitution as conferring on Congress the exclusive power, in tandem with the federal courts, to make laws governing the admiralty and maritime matters. *See Jensen*, 244 U.S. at 214–15.

Court explained, "is valid if it . . . works material prejudice to the characteristic features of the general maritime law, or interferes with the proper harmony and uniformity of that law in its international and interstate relations." *Id.* at 216. Over Justice Holmes' dissent, *see id.* at 218–23, *Jensen* thus "constitutionally barred [States] from applying their compensation systems to maritime injuries," *Sun Ship, Inc. v. Pennsylvania*, 447 U.S. 715, 717 (1980).[20]

Not long after *Jensen*, however, the Supreme Court retreated slightly from that ruling in *Western Fuel Co. v. Garcia*, 257 U.S. 233 (1921). The Court addressed the availability of recovery under state wrongful death statutes in admiralty at a time when no comparable cause of action was available under general maritime law.[21] *See id.* at 240–42. In preserving the availability of recovery under state law, the Supreme Court reasoned that the "subject is maritime and local in character," and that the state law "will not work material prejudice to the characteristic

---

[20] For a more complete history of Congress's and the Supreme Court's response to *Jensen* and the "maritime but local" doctrine in the first half of the twentieth century, *see Sun Ship*, 447 U.S. at 717–19.

[21] This body of law has greatly shifted in ways not relevant to this case. *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375 (1970); *Yamaha Motor Corp. U.S.A. v. Calhoun*, 516 U.S. 199 (1996).

features of the general maritime law, nor interfere with the proper harmony and uniformity of that law in its international and interstate relations." *Id.* at 242 (citing *Jensen*, 244 U.S. 205).

When dealing with cases involving federal maritime concerns, as to which state law pulled in an opposite direction, the Supreme Court has weighed the competing claims in a manner often leading to unpredictable results. *See Davis v. Dep't of Lab. & Indus. of Wash.*, 317 U.S. 249, 252 (1942) ("When a state could and when it could not grant protection under a compensation act was left as a perplexing problem, for it was held 'difficult, if not impossible' to define this boundary with exactness."); *id.* at 253 ("This Court has been unable to give any guiding, definite rule to determine the extent of state power in advance of litigation, and has held that the margins of state authority must 'be determined in view of surrounding circumstances as cases arise.'" (quoting *John Baizley Iron Works v. Span*, 281 U.S. 222, 230 (1930) (rejecting application of state workers' compensation law)) (applying state workers' compensation law).

In 1922, in *Grant Smith-Porter Ship Co. v. Rohde* ("*Rohde*"), which we discuss further below, the Supreme Court allowed the application of an exclusive remedy

48

provision in a state workers' compensation act to bar a claim in admiralty. 257 U.S. 469, 478 (1922). A few years after *Rohde*, the Supreme Court invalidated the application of a state workers' compensation scheme, without expressing concern for the law's exclusive remedy provision, because the underlying issue was found to be maritime in nature rather than of primarily local concern. *See Northern Coal & Dock Co. v. Strand*, 278 U.S. 142, 144–45 (1928). Then in *P.J. Carlin Construction Co. v. Heaney* ("*Heaney*"), the Supreme Court declined to invalidate a worker's compensation award under New York law, rejecting the argument of the employer and its insurance carrier that maritime law applied instead. 299 U.S. 41, 43–45 (1936). The Fire District relies on *Rohde*, as well as *Heaney*.

Later, however, two Supreme Court rulings, in the face of state rules that might have defeated federal maritime remedies, gave preference to enforcing a maritime remedy (or a remedy closely related to an available maritime remedy). In *Pope & Talbot v. Hawn*, a carpenter was injured aboard a vessel docked on navigable waters. 346 U.S. at 407. The injured worker filed general maritime claims of unseaworthiness and negligence against the vessel owner, who sought to defeat the liability on the ground that the worker had been contributorily negligent. *Id.*

49

The appeal raised the question whether the State's rule of contributory negligence as a categorical bar to liability should defeat the worker's recovery in admiralty, where the federal rule of comparative negligence would have otherwise allowed the federal remedy, reduced to the degree that the injury was attributable to the worker's own negligence. *Id.* at 408. The Court opted for the maritime rule, stating that, while ordinarily the injured worker's rights would be governed by Pennsylvania law, as he was injured in Pennsylvania, instead his action is a federal maritime tort in admiralty, because the worker was "injured on navigable waters while working on a ship to enable it to complete its loading for safer transportation of its cargo by water." *Id.* at 409. The Court stated that the worker's "right to recovery for unseaworthiness and negligence is rooted in federal maritime law." *Id.* And regardless, the Court reasoned, "While states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court." *Id.* at 409–10 (footnote omitted). The Court therefore rejected Pennsylvania's contributory negligence rule, which would "deny [the plaintiff's] federal right of recovery." *Id.* at 411.

A few years later, the Court decided *Kossick v. United Fruit Co.* 365 U.S. 731 (1961). *Kossick* concerned a state law contract claim brought in federal court under diversity jurisdiction. *Id.* at 731–32. The plaintiff was a seaman who had become ill while employed on the defendant's vessel. *Id.* at 732. As a seaman, the plaintiff was entitled to the maritime remedy of maintenance and cure. *Id.* This would have entitled him to have the defendant pay for his care at a public hospital. *Id.* at 737. However, he was not suing in admiralty for maintenance and cure. Persuaded that a public hospital would not provide him with adequate care for his illness, the plaintiff had insisted that the shipowner pay for his care at a *private* hospital. *Id.* at 732. The parties had eventually reached an oral agreement under which the ship owner had agreed on terms to make payments for his care at a private hospital. *Id.* He sued to enforce that contract. *Id.*

Because the contract was oral, application of the State's Statute of Frauds would have barred recovery. *Id.* at 733. The federal rule applicable to maritime contracts would have allowed its enforcement. *Id.* at 734. In choosing which law to apply, the Court ultimately weighed whether the circumstances were of a predominantly local character and whether application of state law would disturb

51

the uniformity of general maritime law. *Id.* at 738 (first citing *W. Fuel Co.*, 257 U.S. at 242; then citing *Jensen*, 244 U.S. 205). The Court first rejected the categorical proposition that, because maritime law is federal and therefore supreme by virtue of Article VI, "wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant." *Id.* at 739.

Nonetheless, the Court found "considerations" that "point[ed] to an accommodation favoring the application of maritime law." *Id.* at 741. In view of the very close relationship between the contract terms and the plaintiff's entitlement to the maritime remedy of maintenance and cure, the court found it "difficult to deny the essentially maritime character of this contract . . . ." *Id.* Considering the fact that sailors of any nationality might join a ship at any port in the world and thereafter, on becoming ill, would have an entitlement to have the ship put into the first available port if necessary to provide adequate maintenance and cure, it seemed that such a contract might have been made anywhere in the world, so that "the validity of it should be judged by one law wherever it was made." *Id.* The Court was therefore "hard put to perceive how this contract was

peculiarly a matter of state and local concern."[22] *Id.* (internal quotation marks omitted). The Court ultimately concluded that the lower courts had erred in applying the New York Statute of Frauds to bar proof of the agreement alleged in the complaint. *Id.* at 742.

We understand *Pope & Talbot* and *Kossick* to have adopted two principles: (i) a preference for a balancing test, exemplified in *Kossick*, 365 U.S. at 738, in which the court weighs how deeply the underlying state and federal interests engage with the particular facts coupled with (ii) a reluctance (short of a categorical supremacy-based rule of denial) to allow state law rules to defeat a worker's entitlement to a maritime remedy unless the application of state law would not interfere with the essential uniformity as to maritime matters.[23]

---

[22] The Court was also influenced by the fact that the asserted liability rested on a contract voluntarily entered into by the parties, "and not, as in the case of tort liability or public regulations, obligations imposed simply by virtue of the authority of the State or Federal Government." *Kossick*, 365 U.S. at 741. That fact created "some presumption in favor of applying that law tending toward . . . validation . . . ." *Id.*

[23] *See Petition of Alva S. Co.*, 405 F.2d 962, 969–70 (2d Cir. 1969) ("The Supreme Court, especially in recent years, has allowed the application in admiralty of state laws which broaden the scope of a party's liability beyond that recognized in the maritime law, while it has tended to reject the application in admiralty of state laws which narrow or wholly defeat a previously recognized maritime right of recovery." (internal citations omitted) (first citing *Hess v. United States*, 361 U.S. 314 (1960) (applying admiralty law, which incorporates state law concerning recovery for

In our view, *Rohde*, notwithstanding that it enforced a state statute in preference to a federal enactment, does not necessarily give solid support to the Fire District's position. This is because it is consistent with *Kossick* in weighing the relative engagement of federal and state interests in the facts of the dispute. In *Rohde*, the Supreme Court, responding to questions certified to it by the Ninth Circuit, concluded that the exclusivity provision of a state workers' compensation act abrogates the otherwise available right of a worker injured on a ship docked on navigable waters to damages against his employer in admiralty. *See* 257 U.S. at

---

wrongful death); then citing *Just v. Chambers*, 312 U.S. 383 (1941) (allowing for state survival statutes to apply in general maritime law); then citing *Pope & Talbot*, 346 U.S. 406; then citing *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 245 (1942) ("The constant objective of legislation and jurisprudence is to assure litigants full protection for all substantive rights intended to be afforded them by the jurisdiction in which the right itself originates.") (applying federal maritime law over state law)).

While cases subsequent to *Kossick* concerned either whether a federal remedy should become available or whether state remedies remain available after an applicable federal remedy has been created, the Supreme Court has occasionally mentioned in those discussions a preference for preserving the availability of a federal right rather than allowing state law to bar that right. *See Norfolk Shipbuilding & Drydock Corp.*, 532 U.S. at 815–16 ("It is true . . . that we have held admiralty accommodation of state remedial statutes to be constitutionally permissible, but that does not resolve the issue here: whether *requiring* such an accommodation by refusing to recognize a federal remedy is preferable as a matter of maritime policy. We think it is not." (citations and footnote omitted)); *Sun Ship*, 447 U.S. at 724 n.6 (stating that most awards under state compensation schemes would not be "conclusive" so as to bar federal recovery (citing *Calbeck v. Travelers Ins. Co.*, 370 U.S. 114, 131–32 (1962))).

473–74, 478. The libelant (or plaintiff) was a carpenter who was injured while working for a shipbuilder in the construction of a docked vessel, which was partially complete and not yet ready for delivery. *Id.* at 473–74. His claim was that his employer had been negligent in the construction and maintenance of a scaffolding erected in the construction of a bulkhead. *Id.* at 474.

> The Court's explanation for its ruling was that
>
> [u]nder such circumstances regulation of the rights, obligations and consequent liabilities of the parties, as between themselves, by a local rule would not necessarily work material prejudice to any characteristic feature of the general maritime law, or interfere with the proper harmony or uniformity of that law in its international or interstate relations.

*Id.* at 476 (first citing *Jensen*, 244 U.S. 205; then citing *W. Fuel Co.*, 257 U.S. 233). The court concluded furthermore that the employer's contract for the construction of a vessel was "nonmaritime." *Id.* at 475. The factors supporting that decision are apparent. While a ship after completion and delivery can circumnavigate the globe, during construction it is generally stationary and local, much like a building. *See Kossick*, 365 U.S. at 735 ("[A] contract to repair or to insure a ship is maritime, but a contract to build a ship is not." (internal citations omitted)). Furthermore, as the *Rohde* Court noted, the injured worker's employment was

55

local, *Rohde*, 257 U.S. at 475; neither his employment nor his activities on the job "had any direct relation to navigation or commerce," *id.* at 476; and the parties had contracted in reference to the state law rather than to general maritime law, *id.* at 476–77. All those considerations apparently contributed to the Court's sense that the policies supporting maritime remedies were not as deeply engaged by the particular facts as the state policies protecting local workers who suffered injury and that enforcement of the state rule to bar enforcement of the maritime remedy would not interfere unduly with uniformity in the maritime regimen.

We do not find the Fire District's effort to apply the holding of *Rohde* to the facts of our case to be highly persuasive. That holding certainly did not imply the existence of a general rule that an exclusivity provision of a state workers' compensation law will abrogate a maritime remedy, irrespective of how deeply the policies underlying the provision of maritime remedies engage with the facts of the case. The factors in *Rohde* that favored enforcing the state law bar in

preference to the otherwise available maritime remedies are not present in this case.[24]

Nor does *Heaney*, in our view, give support to the Fire District's arguments. To the contrary, that ruling further supports the Supreme Court's preference (as expressed in *Kossick*) for weighing the relative engagement of the state and federal policies with the facts of the case. The claimant in *Heaney* was a bricklayer, employed by a construction company on a construction project for the City of New York on Rikers Island, which lies in the navigable waters of the East River.[25] *Heaney*, 299 U.S. at 42. His employer had contracted with a ferry boat to transport workers to and from the construction site. *Id.* at 42–43. The claimant was injured by an explosion on the ferry boat. *Id.* at 43. He brought a proceeding before a New York administrative tribunal to recover compensation from the employer and its compensation insurer. *Id.* at 42. The employer and the insurer objected to the jurisdiction of the state tribunal, contending that this was a maritime matter within

---

[24] *See infra* Part II.C.

[25] *See Heaney v. P. J. Carlin Const. Co.*, 269 N.Y. 93, 95 (1935), *aff'd,* 299 U.S. 41 (1936).

the exclusive jurisdiction of the federal courts. *Id.* at 43–44. The Supreme Court disagreed, upholding New York's authority to award the state law compensation remedy. *See id.* at 45.

Although the Court stated that "the maritime law cannot be modified by state enactments so as materially to interfere with its essential uniformity," it concluded that "this doctrine . . . has no application in the circumstances [there] presented." *Id.* at 44. The Court laid out factors that warranted upholding the State's authority to award compensation in the circumstances: (i) the liability assumed by the employer and its insurance carrier was pursuant to a "nonmaritime contract," *id.*; (ii) the accident and the parties were within the limits of New York State, *id.*; (iii) the contract had "no direct relation to navigation," *id.*; (iv) the claimant's employment, being in a dry-land construction project, "had no direct and immediate relation to navigation, business or commerce of the sea," *id.* at 45; and (v) the dispute did not include a claim against the ship or its owner, *id.* at 44. So, after weighing whether the underlying claim was of a maritime or local character, the Court concluded that state law applies. *Id.* at 45.

Contrary to the Fire District's contention that *Heaney* has "direct application" to our case, Appellee's Br. at 42, *Heaney* is yet another example of the balancing of state and federal interests when faced with a conflict between a state workers' compensation law and admiralty law, which, *on the facts of that case*, favored the conclusion that the relationship between employer and employee was more local than maritime. As to the *Heaney* factors numbered (iii), (iv), and (v) above, the facts of the present case are significantly different and tend to favor preservation of the federal remedy.

## B. The Decisions of Other Circuit Courts

Our circuit has not considered whether a state statute's exclusive remedy provision bars a general maritime claim.[26] We turn to the decisions of other circuits

---

[26] *Cf. Petition of Alva S. Co.*, 405 F.2d at 966 ("Because of the view we take of New York law we have no occasion to review the district court's holding that a state law providing for governmental immunity can be applied to defeat an otherwise meritorious admiralty cause of action seeking damages for a maritime tort."); *but see id.* at 969 ("We think it clear that there can be no objection to the application of state law in the area of governmental tort liability when it does not defeat an otherwise meritorious maritime cause of action.").

Dyckman contends that our decision in *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2d Cir. 1987), has decided the issue. We think not. In *Lopez*, a former employee brought a § 1981 suit against his employer, alleging that a discriminatory and hostile working environment led him to resign. *Id.* at 1186. Lopez's employer asserted that New York's Workers' Compensation Law barred Lopez's claim for emotional distress under the federal § 1981 statute. *Id.* We explained

to explore how they understood the teachings of the Supreme Court's decisions on the question before us. The circuits that have considered the question have not been uniform. The Third and Fifth Circuits, following the Supreme Court's admonition in *Pope & Talbot* that "a state may not deprive a person of any substantial admiralty rights," 346 U.S. at 410, have adopted a categorical rule that the Supremacy Clause requires that a federal remedy take precedence over a conflicting state law. *See Green v. Vermilion Corp.*, 144 F.3d 332, 336–37 (5th Cir. 1998) (following Fifth Circuit precedents that relied on *Pope & Talbot*); *Purnell v. Norned Shipping B.V.*, 801 F.2d 152, 156 (3d Cir. 1986).[27] Dyckman urges us to follow this course.

---

that "we do not read the workers' compensation law to deny relief under a federal statute. Were state law to erect such a bar, it would clearly run afoul of the Supremacy Clause of the U.S. Const. Art. VI, cl. 2." *Id.* (citation omitted). *Lopez*, in which a state law would bar relief provided under a federal statute, certainly gives inferential help to Dyckman's position, but, in part because it does not involve the maritime jurisdiction, and in part because its categorical terms are at odds with the teachings of the Supreme Court in *Kossick*, it is not directly on point. We cannot regard it as answering the question before us.

[27] The Third Circuit's *Purnell* ruling provided an alternate ground: that the terms of the state statute rendered its exclusive remedy provision inapplicable to the facts of the case. *See Purnell*, 801 F.2d at 156.

We cannot agree with this adoption of a categorical rule of supremacy for the federal remedy because this was explicitly disavowed by the Supreme Court in *Kossick,* subsequent to the pronouncement in *Pope & Talbot*.[28] *See Kossick*, 365 U.S. at 739 (rejecting the argument that just because maritime law is "federal law and therefore supreme by virtue of Article VI of the Constitution," this implies that "wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing and significant"); *see id.*

---

[28] The Ninth Circuit in *Western Boat Building Co. v. O'Leary*, 198 F.2d 409, 411–12 (9th Cir. 1952), addressed the closely related question of concurrent availability of compensation under the LHWCA, notwithstanding the exclusive remedy provision of the state compensation law. We do not consider that ruling because it predated the Supreme Court's *Pope & Talbot* and *Kossick* rulings.

 While not addressing state exclusive remedy provisions, two other circuits did not explicitly balance state and federal interests but instead reasoned that a state rule should not be applied because it would bar a federal right of recovery and it would impair the uniformity of federal maritime law. *See Byrd v. Byrd*, 657 F.2d 615, 617 (4th Cir. 1981) (fashioning new rule of admiralty law because applying state rule of interspousal immunity "would impair the uniformity and simplicity" of general maritime law and "would defeat an otherwise meritorious maritime cause of action"); *St. Hilaire Moye v. Henderson*, 496 F.2d 973, 981–82 (8th Cir. 1974) (declining to apply state statute limiting recovery for social guests on boats because it would interfere with a federal action, citing *Pope & Talbot,* and because it would be disruptive of federal uniformity). We agree that the federal interests in the availability of federal recovery and in the uniformity of general maritime law are significant, but we also conclude that, consistent with *Kossick*, these interests are weighed alongside competing state interests.

(insisting that "the process is surely rather one of accommodation" of both state and federal interests).

The Fire District relies on the Eleventh Circuit's decision in *Brockington v. Certified Electric, Inc.*, which weighed the competing state and federal interests to conclude that an exclusive remedy provision of a State's workers' compensation law would be enforced and would bar a federal maritime remedy. 903 F.2d 1523, 1533 (11th Cir. 1990). In that case, a land-based electrician sought recovery against his employer under general maritime law for injuries he sustained while aboard a boat traveling either to or from his dry-land job site. *Id.* at 1525. The electrician had received payments under a state compensation law, which included a provision that compensation payments were the exclusive remedy available against the employer. *Id.* at 1529.

In adopting a balancing test, the Eleventh Circuit acknowledged that, while there is a general rule that general maritime law applies in admiralty, there are exceptions to this federal supremacy, and "federal courts sitting in admiralty should, according to the dictates of comity, acknowledge and protect state-created rights, even at times to the exclusion of an existing maritime law." *Id.* at 1530. In

the case before it, the court decided that the substantial state interests underlying an action that was "peculiarly local" outweighed the minimal federal interests in promoting uniformity and preserving the federal remedy. *Id.* at 1532 (internal quotation marks omitted); *see id.* at 1530–33.

In accordance with our understanding of the Supreme Court's framework, as applied early in *Rohde* and then further developed in *Kossick*, we agree with the Eleventh Circuit's general approach of balancing state and federal interests. However, because a balancing test inevitably depends on the particular facts of the case, our adoption of the test advocated by the Fire District does not by itself determine the outcome of this case.

### C. Balancing the State and Maritime Interests Under *Kossick*

In weighing the competing local and federal interests in this matter, we find that both sides had a significant interest in the application of their respective laws. New York had a substantial interest in the enforcement of New York's workers' compensation law, which ensures "consistent recourse for injured firefighters" without need to prove fault, and governs the parties' expectations in their employment relationship. Appellee's Br. at 48. New York's interest was not limited

to providing compensation to injured workers. The State also had a strong interest in the preservation of the bargain it imposed on employers. In exchange for providing compensation regardless of whether the employer was in any way at fault, employers are relieved of liability on any other basis. The state policy is to provide significant protections to both employees injured in the course of their employment and to their employers. *See* N.Y. Vol. Fire. Ben. L. §§ 6, 19. In the case before us, the employer will have performed its part of the bargain by paying its mandatory premiums into the workers' compensation fund. Accordingly, the State's interest in enforcing both sides of its balanced scheme of protections is impaired if the injured employee is allowed to recover maritime tort damages from the employer over and above the employer's payment of its premiums into the insurance fund.

At the same time, federal law, emanating from both Congress and the federal courts, generally has stewardship over maritime matters. *See United States v. Rands*, 389 U.S. 121, 122–23 (1967) (explaining that the Commerce Clause confers upon the federal government the power to regulate navigable waters), U.S. Const. art. III, § 2 (conferring on the federal courts jurisdiction over the Admiralty), and

64

*Jensen*, 244 U.S. at 214–15 (recognizing that Congress and the federal courts act in tandem in making laws governing the maritime realm). Federal law, whether fashioned by Congress or the federal courts, has evinced a strong interest in providing adequate remedies for the injuries suffered by workers in maritime commerce. In *Socony-Vacuum Oil Co. v. Smith*, while explaining the "special circumstances attending their calling" that merit distinct treatment, the Supreme Court characterized seamen as "the wards of the admiralty." 305 U.S. 424, 431 (1939). The federal interest extends not only to securing adequate compensation for their wards, but also to promoting safety in the conduct of maritime commerce by requiring shipping interests to pay for injuries they inflict on maritime workers through derelictions of their duties. The remedy provided by New York's compensation law is not as complete a remedy as would be due under the maritime law to one injured in the course of maritime employment due to the fault of the vessel owner or the unseaworthiness of the vessel. If Dyckman can succeed in showing that his injury was proximately caused by negligence of the crew of Marine I or unseaworthiness of the vessel, both of those interests are better served

by giving him access to the federal maritime remedies he claims than by confining him to the state's compensation award.

Although only a small part of Dyckman's employment took place on the navigable waters, and he therefore was not a seaman under the Jones Act, on the occasions when he was engaged in a firefighting mission on the waters aboard the Marine I his work was distinctly maritime. This case is unlike the cases of injuries to land workers, whose presence on a ship was only for transportation to their land-based jobs, *see Heaney*, 299 U.S. at 42–43; *Brockington*, 903 F.2d at 1525; to a construction worker on an unfinished vessel, still immobilized at a dock, *Rohde*, 257 U.S. at 475; to an underwater diver off a floating barge, *Millers' Indem. Underwriters v. Braud*, 270 U.S. 59, 62 (1926); and to a scaffolding installer on a ship in dry dock, *Durando v. City of New York*, 963 N.Y.S.2d 670, 672–73 (N.Y. App. Div. 2013). Fires occur on vessels, as well as on dry land, and when they do, the firefighting and rescue job often falls to firefighting vessels and their crews. Being a maritime firefighter aboard a firefighting vessel is maritime work. One whose full-time duty, unlike Dyckman's, is a firefighting job on a marine firefighting vessel is a seaman. If Dyckman's job, when joining a firefighting mission on

Marine I, was to do waterborne firefighting and rescue, that job was no less maritime while he was doing it than it would have been if he had been permanent crew to a firefighting vessel. Dyckman also asserts that he was in the bow preparing to secure the vessel and that when he extended his foot, his purpose was to avoid a collision, both tasks being seaman's jobs carrying seaman's risks.

Neither the Fire District nor the district court has advanced a persuasive reason for granting summary judgment dismissing Dyckman's claims. To the extent that the district court relied on the exclusivity provision of the state compensation law, its enforcement to the exclusion of a federal maritime remedy is to be determined by the balancing test espoused in *Kossick*.

We conclude for the reasons stated above that giving effect to the State's exclusive remedy provision so as to deprive Dyckman of whatever maritime remedies he can prove would "work material prejudice to the characteristic features of the general maritime law, [and] interfere with the proper harmony and uniformity of that law in its international and interstate relations." *W. Fuel Co.*, 257 U.S. at 242 (citing *Jensen*, 244 U.S. 205). While we disavow any automatic conclusion that "wherever a maritime interest is involved, no matter how slight or

marginal, it must displace a local interest, no matter how pressing and significant," *Kossick*, 365 U.S. at 739, we read the Supreme Court precedents as protecting the applicability of maritime remedies, as against conflicting state law, when, unlike the situations in *Rohde* and *Heaney*, federal maritime tort policy engages sufficiently with the facts, so that displacement of the federal remedy because of a state's exclusivity provision would impair uniformity of the federal maritime law. We leave it to the proceedings in the district court on remand to determine whether this evidence should be believed and whether Dyckman was doing seaman's work and incurring a seaman's hazards.

## CONCLUSION

The judgment of the district court is VACATED, and the matter is REMANDED for further proceedings not inconsistent with this ruling.